# IN THE SUPREME COURT OF IOWA

No. 15–0328

Filed June 16, 2017

TOM BRAKKE and RHONDA BRAKKE d/b/a/ PINE RIDGE HUNTING LODGE, and McBRA, INC.,

Appellees,

vs.

IOWA DEPARTMENT OF NATURAL RESOURCES and IOWA NATURAL RESOURCE COMMISSION,

Appellants.

---

Appeal from the Iowa District Court for Polk County, Dennis J. Stovall, Judge.

The Iowa Department of Natural Resources appeals from a district court order ruling an emergency order was outside of its legislative grant of authority. **AFFIRMED.**

Thomas J. Miller, Attorney General, David L. Dorff, Assistant Attorney General, for appellants.

Rebecca A. Brommel and Douglas E. Gross of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for appellees.

**APPEL, Justice.**

This case presents a challenge by landowners to an emergency order issued by the Iowa Department of Natural Resources (DNR) to order the landowners to quarantine land formerly used as a whitetail deer preserve for five years after whitetail deer harvested on the property tested positive for chronic wasting disease, or CWD. The DNR emergency order required the landowners to repair and maintain an electric fence around the property for the quarantine period.

The landowners challenged the DNR emergency order in an administrative appeal under the Iowa Administrative Procedures Act, Iowa Code section 17A.19(10) (2013). An administrative law judge issued a proposed decision, finding the DNR lacked the statutory authority to issue the emergency order imposing a quarantine on the land. Upon review by the Iowa Natural Resources Commission (NRC), the NRC reversed the ruling, finding instead that the DNR had sufficient statutory authority to support the order. The landowners appealed.

The district court reversed the NRC. The court held the DNR's emergency order was irrational, illogical, and wholly unjustifiable under Iowa Code section 17A.19(10)(*l*) because the DNR was acting outside the legislature's grant of authority. The court, however, rejected the landowners' argument that the DNR's emergency order amounted to a compensable taking under the United States and Iowa Constitutions. Upon entering its judgment, the court also refused to reopen the record to allow the DNR to present additional evidence that the landowners received certain indemnity payments from the United States Department of Agriculture (USDA).

The DNR appealed, and the landowners cross-appealed. For the reasons expressed below, we conclude the DNR lacked statutory

authority to issue an emergency order that imposed a quarantine on land used as a whitetail deer-hunting preserve. We also conclude the action of the DNR did not amount to an impermissible taking of property under the United States Constitution or the Iowa Constitution. In light of these rulings, we conclude the DNR's challenge of the district court's failure to reopen the record to receive additional evidence is moot. We therefore affirm the judgment of the district court.

**I. Factual and Procedural Background.**

**A. Introduction: Positive CWD Test from Deer Harvested at the Pine Ridge Hunting Lodge.** In the 1990s, Tom and Rhonda Brakke (the Brakkes) established a whitetail deer-breeding farm in Clear Lake, Iowa. In 2005, they bought Pine Ridge Hunting Lodge (Pine Ridge) in Davis County, Iowa, for $575,000.[1] The Brakkes' purpose in purchasing the hunting lodge was to provide an "end market" for the deer they raised on the Clear Lake property. After the purchase, the Brakkes spent an additional $200,000 to improve the property by constructing a cabin and investing in additional fencing, including a fence to separate the northern and southern halves of the property, which prevented deer from the north side from entering the south side of the preserve and vice versa.

The property was licensed as a whitetail deer-hunting preserve under Iowa Code chapter 484C. The majority of the deer the Brakkes placed at Pine Ridge came from their Clear Lake breeding farm.

Whitetail deer are susceptible to CWD. CWD is a type of transmissible spongiform encephalopathy, also known as prion disease. The DNR seeks to prevent the spread of CWD through voluntary

---

[1]The north half of the property was purchased by McBra, Inc. through a 1031 exchange, while Tom and Rhonda personally purchased the south half of the property. For the purposes of this appeal, the owners will be referred to as the Brakkes.

agreements with breeding farms and statutory regulation of whitetail deer-hunting preserves. *See* Iowa Code § 484C.12.

Originally, the Brakkes participated in a voluntary CWD program at their Clear Lake breeding farm so they could transport and sell their deer to others. With the success of their hunting operations at Pine Ridge, in 2012 the Brakkes ceased enrollment of the Clear Lake breeding farm in the voluntary CWD program because they were no longer in the business of selling deer to other operations. The Brakkes, however, continued to submit samples for testing from all deer harvested from Pine Ridge as required by Iowa Code section 484C.12.

On June 16, the DNR received notification from a CWD testing lab that a deer from Pine Ridge tested positive for CWD. The CWD-positive deer originally came from the Brakkes' breeding farm in Clear Lake. After confirming the diagnosis, the DNR notified the Brakkes on July 19. Prior to this case, no captive or wild deer had ever tested positive for CWD in Iowa.

Under Iowa law, the Iowa Department of Agriculture and Land Stewardship (IDALS) regulates whitetail deer on deer farms, while the DNR regulates deer on whitetail deer-hunting preserves. Iowa Code § 170.1A(2); *id.* § 484C.2(2). On August 29, IDALS received permission from the Brakkes to kill and test some deer at the Clear Lake farm. One deer at the Clear Lake farm tested positive for CWD. At some point, IDALS issued a notice of quarantine to the Brakkes for the Clear Lake farm.

**B. September 7, 2012 Agreement.** On September 7, the Brakkes and the DNR signed an "Agreement for Chronic Wasting Disease Recovery Plan at Pine Ridge Hunting Lodge" (Agreement). Under the Agreement, the Brakkes were allowed to carry out planned hunts at Pine

Ridge scheduled between September 8, 2012, and December 25, 2012. The Brakkes, however, were required to install jointly with the DNR an electronic fence inside the perimeter of the existing fence surrounding Pine Ridge, with the costs split evenly between the DNR and Pine Ridge. After construction of the electric fence, the Brakkes were solely responsible for fence repair and maintenance. DNR staff was to conduct weekly perimeter and fence inspections, with all repairs identified by DNR staff to be submitted to the Brakkes in writing and completed by the Brakkes within twenty-four hours.

Further, the Agreement provided that Pine Ridge be completely depopulated of all deer and elk no later than January 31, 2013. All animals were to be tested for CWD and disposed of in accordance with applicable regulations at the Brakkes' cost. Once the depopulation of Pine Ridge was complete, the Brakkes, at their expense, agreed to clean and disinfect the facility in compliance with DNR rules. Finally, the parties agreed to a future operational plan to "be developed in conjunction with the DNR after depopulation was complete." The term of the Agreement was from the date of execution until January 31, 2013.

One additional deer harvested at Pine Ridge in December 2012 tested positive for CWD. After the conclusion of the hunts, Pine Ridge depopulated all its deer. In April 2013, all feeders were disinfected with bleach, excess feed was buried, and all the terms of the Agreement were fulfilled with one exception—the parties did not reach an agreement on a "future operational plan" after depopulation of the animals.

**C. April 26, 2013 Letter.** On April 26, the Brakkes wrote a letter to the DNR. In the letter, the Brakkes stated, "As you know, the area utilized by Pine Ridge Hunting Lodge as a hunting preserve is subject to a five (5) year quarantine." The letter noted that the Brakkes had

"complied with all requirements of the September 7, 2012 agreement." The letter announced that if no response were received from the DNR, the Brakkes would regard all requirements of the Agreement as satisfied. The Brakkes further announced they would no longer be operating Pine Ridge as a whitetail deer-hunting preserve.

By June 5, the DNR discovered the gates at Pine Ridge were standing open and that portions of the fence were damaged or had been removed.

**D. The Emergency Order.** On June 6, the DNR issued an emergency order to require the Brakkes to stop their deconstruction of the fence surrounding Pine Ridge and to immediately restore the portions of the fence that were damaged. The emergency order also required the Brakkes to close and keep closed all of the gates and to authorize the DNR to access Pine Ridge for a limited duration in order to kill any deer that may be present on the property. Finally, the emergency order required the Brakkes submit and agree to execute a plan designed to ensure that CWD be quarantined within, and not spread beyond, Pine Ridge.

On June 7, the Brakkes closed the gates at Pine Ridge and repaired the fence. On June 11, however, wild deer were seen inside the fence.

**E. The Administrative Hearing and the Natural Resource Commission Appeal.**

1. *Introduction.* The Brakkes appealed the emergency order on June 25. In the letter initiating the appeal, the Brakkes claimed the emergency order violated their United States and Iowa constitutional rights and other property rights because (1) the DNR lacked jurisdiction over Pine Ridge once it was no longer a hunting preserve; (2) the terms of

the quarantine and emergency order without compensation were an unconstitutional taking; and (3) the DNR's actions were arbitrary, capricious, and an abuse of discretion.

The Brakkes cited six reasons why the DNR's actions were arbitrary and capricious. First, they claimed only a limited number of deer species may contract CWD and CWD does not meaningfully limit the growth of the species. Second, the Brakkes asserted that CWD is not highly infectious and there is a reservoir of CWD in the wild that cannot be fully eliminated. Third, the Brakkes claimed there are more harmful diseases which affect deer for which the DNR does not impose such drastic measures. Fourth, the Brakkes asserted the emergency order would not materially affect the spread of CWD. Fifth, the Brakkes claimed the DNR previously told them that it had no issues with removing the fence. Finally, the Brakkes alleged that Pine Ridge was separated into two sections and about half of the property was never exposed to CWD.

2. *Contested case hearing.* A contested case hearing was held beginning on November 18. Dale Garner of the DNR testified he understood that the USDA indemnification plan for compensating owners of deer killed as a result of positive CWD tests was no longer available. Neither Iowa in general nor the DNR or the IDALS had an indemnification plan.

The DNR presented evidence that, as a result of the quarantine, the market value of Pine Ridge as real property had declined by $165,000. The DNR's appraiser testified that she had not calculated the value of the Brakkes' lost business in not being able to operate the property as a hunting preserve.

The Brakkes presented evidence from a finance expert with experience in hunting leases that the operating income for Pine Ridge for the year 2013, without any quarantine or restrictions, would have been $157,537. If the Brakkes had operated Pine Ridge as a farm instead of a hunting preserve they would have lost $22,021. The finance expert calculated the five-year total income of Pine Ridge as a hunting preserve at $917,309, while the five-year total income of Pine Ridge as a farm would be negative $100,465. If the Brakkes operated Pine Ridge as a free-range hunting operation, with no fencing or captive animals, the five-year income would be $143,307. On cross-examination, the finance expert admitted he was not a certified public accountant or a licensed appraiser, and he conducted an analysis that was not a business valuation.

After the final hearing on January 8, 2014, the Brakkes and the DNR entered a stipulation to submit additional evidence. The stipulation stated that in December 2013, the Brakkes had killed all the remaining deer at Pine Ridge and the DNR collected samples from all of the adult deer. CWD was not detected in any of the samples.

On February 26, the administrative law judge (ALJ) issued her proposed decision. The ALJ ruled the DNR lacked jurisdiction to issue the emergency order. The ALJ determined Iowa Code chapter 484C only authorized the DNR to quarantine "diseased preserve whitetail," not the land. Thus, the DNR's interpretation of 484C.12 granting them the power to impose a five-year quarantine on "the preserve and all remaining animals located within the infected preserve" was irrational, illogical, and wholly unjustifiable because the interpretation extended, enlarged, and changed the legislature's intent.

3. *Appeal to NRC.* On February 28, the DNR appealed the proposed decision. On April 16, the parties submitted a second joint stipulation regarding the submission of additional evidence. The parties noted they "disagree[d] about the relevancy of this finding," but "[a] wild deer harvested in Allamakee County, Iowa in early December 2013 tested positive for Chronic Wasting Disease." The parties submitted briefs to the NRC, and an unrecorded hearing was held on May 8.

On May 28, the NRC upheld the DNR's emergency order. The commission found the Brakkes had not met their burden in demonstrating that Iowa Administrative Code rule 571—115.10, authorizing the five-year quarantine "on the preserve and all remaining animals located within the infected preserve," was not authorized by chapter 484C. The commission admitted that chapter 484C does not explicitly state that the preserve land is to be quarantined, but it did not need to because the statute also gave the DNR the duty to prevent the spread of CWD. The commission held, as a matter of common sense and given the scientific evidence, a quarantine on the land is required to prevent the spread of CWD.

**F. Judicial Review of NRC Action.** The Brakkes petitioned for judicial review of the NRC's decision on June 27. On December 1, the DNR moved for leave to present additional evidence to the NRC. The DNR alleged the Brakkes had voluntarily depopulated their deer at the Clear Lake farm in August of 2014 and were paid $917,100 in indemnification by the USDA. The Brakkes resisted the motion. The district court denied the motion on December 18, stating it did not anticipate the need for any additional evidence in order for it to address the issues.

The district court issued its ruling on February 13, 2015, reversing the commission and additionally ruling the DNR's actions were not a taking under the United States or Iowa Constitutions. The court found the DNR had been vested with interpretive authority and thus the DNR's interpretation of the law would only be reversed if it was "irrational, illogical, or wholly unjustifiable." The court, however, found it was irrational, illogical, and wholly unjustifiable for the DNR to have interpreted the statute to give it the authority to quarantine a hunting preserve when chapter 484C only specified the authority to quarantine "diseased preserve whitetail." *See* Iowa Code § 484C.12(1). While the legislature intended to prevent the spread of CWD, the legislature clearly did not intend to give the DNR unfettered authority to quarantine any land that came into contact with infected deer. The court also held that the DNR's actions were not a taking because the invasion to the Brakkes' property was temporary, both specifically as a taking per se and also as a taking involving the *Penn Central*[2] factors.

The DNR appealed the district court's decision, and the Brakkes cross-appealed.

## II. Standard of Review.

"Judicial review of agency decisions is governed by Iowa Code section 17A.19." *Kay-Decker v. Iowa State Bd. of Tax Review*, 857 N.W.2d 216, 222 (Iowa 2014). We "apply the standards of section 17A.19(10) to determine if we reach the same results as the district court." *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). The district court may properly grant relief if the agency action prejudiced the substantial rights of the petitioner and if the agency

---

[2]*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978).

action falls within one of the criteria listed in section 17A.19(10)(*a*) though (*n*).  *Id.*

"We defer to the agency's interpretation of law when the legislature has clearly vested that interpretation in the agency's discretion."  *Kay-Decker*, 847 N.W.2d at 222; *Renda*, 784 N.W.2d at 11; *see also* Iowa Code § 17A.19(11)(*c*).  We will overturn an agency's interpretation of law when it has discretion only if the agency's interpretation is "irrational, illogical, or wholly unjustifiable."  Iowa Code § 17A.19(10)(*l*); *Renda*, 784 N.W.2d at 11.

The standard of review for constitutional claims, including with respect to takings, is de novo.  *Harms v. City of Sibley*, 702 N.W.2d 91, 96 (Iowa 2005); *Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 260 (Iowa 2001).

### III.  Statutory Authority of the DNR to Quarantine Land Where Whitetail Deer Test Positive for CWD.

**A. Introduction.**   The parties contest the scope of DNR "quarantine" authority under Iowa Code section 484C.12.  The Brakkes point out the quarantine authority extends only to preserve whitetail deer, while the DNR suggests the power to quarantine preserve whitetail deer necessarily includes the power to exclude deer from reserve property where CWD has been discovered.

**B.  Statutory Framework.**

1. *Relevant provisions of the Iowa Administrative Procedures Act.* This appeal is brought under the Iowa Administrative Procedures Act. Under Iowa Code section 17A.23(3), "[a]n agency shall have only that authority or discretion delegated to or conferred upon the agency by law and shall not expand or enlarge its authority or discretion beyond the powers delegated to or conferred upon the agency."

2. *Statutory authority of NRC and DNR.* Iowa Code chapter 484C generally grants DNR the authority to regulate preserve whitetail. Iowa Code § 484C.2(2). The statute defines "preserve whitetail" as a "whitetail kept on a hunting preserve." *Id.* § 484C.1(8). The statute defines a hunting preserve as "land where a landowner keeps preserve whitetail as part of a business, if the business's purpose is to provide persons with the opportunity to hunt the preserve whitetail." *Id.* § 484C.1(6).

Iowa Code section 484C.12 concerns testing for CWD. Section 484C.12(1) provides,

> Preserve whitetail that are purchased, propagated, confined, released, or sold by a hunting preserve shall be free of diseases considered reportable for wildlife . . . . The department may provide for the quarantine of diseased preserve whitetail that threaten the health of animal populations.

*Id.* § 484C.12(1). Section 484C.12(2) relates to plans for eradication of diseases. It provides,

> The landowner, or the landowner's veterinarian, and an epidemiologist designated by the department shall develop a plan for eradicating a reportable disease among the preserve whitetail population. The plan shall be designed to reduce and then eliminate the reportable disease, and to prevent the spread of the disease to other animals. The plan must be developed and signed within sixty days after a determination that the preserve whitetail population is affected with the disease. The plan must address population management and adhere to rules adopted by the department. The plan must be formalized as a memorandum of agreement executed by the landowner or landowner's veterinarian and the epidemiologist. The plan must be approved by the department.

*Id.* § 484C.12(2).

3. *Rules related to quarantine arising from CWD.* The DNR has promulgated a rule related to its power to impose a quarantine as a result of an outbreak of CWD. The rule provides,

> A positive test result for chronic wasting disease will result in a minimum of a five-year quarantine on the preserve and all remaining animals located within the infected preserve. No animal movement in or out of the preserve shall occur during the quarantine period.

Iowa Admin. Code r. 571—115.10.

The language of the rule is different than that under Iowa Code section 484C.12(1). Iowa Code section 484C.12(1) provides the DNR may provide for the quarantine of "diseased preserve whitetail," while the rule provides for a five-year "quarantine on the preserve and all remaining animals located within the infected preserve." *Compare* Iowa Code § 484.12(1), *with* Iowa Admin. Code r. 571—115.10.

**C. Positions of the Parties**. The DNR[3] argues the district court erred when it concluded that the DNR was irrational, illogical, and wholly unjustifiable to interpret Iowa Code section 484C.12 as granting the DNR authority to quarantine Pine Ridge.

The DNR argues that the word "quarantine" in Iowa Code section 484C.12(1) must be understood as not only applying to the whitetail deer that were originally at Pine Ridge, but also to the physical property itself, even when no deer are present. According to the DNR, prions that cause CWD are known to persist in the environment for some time even after all infected deer have been removed or the property has ceased operating as a hunting preserve. The DNR asserts that killing all deer and then cleaning and disinfecting the premises are only part of a fully effective response to an outbreak of CWD. The DNR maintains that in order to provide effective containment of CWD, wild deer must be kept out of the

---

[3]Both the DNR and the NRC were named as parties in the litigation. For convenience, we will collectively refer to both parties as the DNR unless context suggests the singular usage.

premises for an extended period of time in order to prevent them from becoming infected.

Interpreting a quarantine otherwise, the DNR asserts, is itself irrational, illogical, and wholly unjustifiable because it ignores the express intent of the legislature to combat CWD due to the particular threat it poses to the health of Iowa's animal populations, including the wild populations. The DNR points out no other particular disease is mentioned in chapter 484C but CWD, indicating this disease was of special concern to the legislature. *See* Iowa Code § 484C.12. According to the DNR, it would make no sense for a legislature so concerned with CWD to deny the state regulatory authorities the ability to protect the whitetail population from a primary pathway for transmission of the disease, namely exposure to prion-contaminated land.

In response to the Brakkes' argument that the plain meaning of Iowa Code section 484C.12 clearly deprives the DNR of jurisdiction in this case, the DNR argues we must view the statute as a whole. In context, the legislature's use of "hunting preserve" and "preserve whitetail" do not reveal the legislature's intent with respect to the term "quarantine." *See id.* The DNR asserts that restricting access to a space is inherent in the term "quarantine." The DNR also points to the scientific evidence it introduced showing the continuing virulence of prion-contaminated areas. The DNR concludes by disputing the Brakkes' characterization of CWD as a disease with low impact on deer populations and the hunting industry.

The Brakkes state that when an agency exceeds its authority, it acts without jurisdiction, and such acts are therefore void. Here, the Brakkes argue that under the language of Iowa Code section 484C.12, the DNR has jurisdiction only over "preserve whitetail" and "hunting

preserves," which the statute defines. *See id.* § 484C.1(6), (8). The Brakkes assert the DNR only has the power to impose a "quarantine of diseased preserve whitetail" that threaten the health of animal populations. *Id.* § 484C.12(1).

The Brakkes dispute the DNR's focus on the word "quarantine." The Brakkes suggest the focus cannot be on the word "quarantine" but instead on "quarantine of diseased preserve whitetail" under section 484C.12(1). The Brakkes note that as of June 6, 2013, the date of the emergency order, they did not have any "diseased preserve whitetail" at Pine Ridge, which itself was no longer a hunting preserve. According to the Brakkes, agencies lose jurisdiction over licenses when the license ends, with the only exception being when the legislature expressly provides for continuing jurisdiction.

The Brakkes also dispute the significance of CWD on the health of Iowa's population of whitetail deer. According to the Brakkes, CWD already exists at a low level in the wild deer population, with no scientific evidence showing a negative aggregate effect of CWD on deer populations. The Brakkes also argue that any harm CWD causes can be mitigated by ordinary, animal disease-management techniques—a five-year quarantine is not scientifically justified.

The Brakkes stress that, before the emergency order, the DNR had never issued a quarantine nor any instructions to the Brakkes indicating there was a quarantine on the property. Under the agreement the parties signed, deer were permitted to enter and leave Pine Ridge, thereby suggesting a quarantine was not in place. The Brakkes also argue that because the DNR believed it did not have the ability to close the gates at Pine Ridge once it learned the gates were open, DNR did not believe it had a quarantine on Pine Ridge or jurisdiction to take action on its own

against Pine Ridge. The DNR's claim that the quarantine existed as a matter of law prior to the Brakkes' surrender of their license is, according to the Brakkes, belied by the facts.

**D. Framework for Assessment of the Validity of the Substantive Agency Rule.** An agency rule is "presumed valid unless the party challenging the rule proves 'a "rational agency" could not conclude the rule was within its delegated authority.' " *Meredith Outdoor Advert., Inc. v. Iowa Dep't of Transp.*, 648 N.W.2d 109, 117 (Iowa 2002) (quoting *Milholin v. Vorhies*, 320 N.W.2d 552, 554 (Iowa 1982)); *see also Iowa Med. Soc. v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 839 (Iowa 2013). The party seeking to invalidate a rule is required to show by clear and convincing evidence that the rulemaking was beyond the agency's statutory authority. *Davenport Cmty. Sch. Dist. v. Iowa Civil Rights Comm'n*, 277 N.W.2d 907, 910 (Iowa 1979) (suggesting the standard is the same as "substantial evidence"); *Schmitt v. Iowa Dep't of Soc. Servs.*, 263 N.W.2d 739, 744 (Iowa 1978) (analyzing whether agency's administrative rule was "beyond the authority delegated to it"); Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L. Rev. 731, 908–09 (1975).

While we grant deference to the agency's interpretation of the statute when the legislature has clearly vested that interpretation in the agency, ultimately the interpretation and construction of a statute is an issue for the court to decide. *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643 (Iowa 2008); *accord Schmitt*, 263 N.W.2d at 745. In interpreting the grant of statutory authority to the agency, we "will not look beyond the express terms of the statute if the text of the statute is plain and its meaning clear." *Neal v. Annett Holdings, Inc.*, 814

N.W.2d 512, 519 (Iowa 2012). A statute is not plain or clear "if reasonable minds could differ or be uncertain as to the meaning of the statute." *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996). "The plain provisions of a statute cannot be altered by administrative rule." *Schmitt*, 263 N.W.2d at 745.

An agency possesses no common law or inherent powers. *Branderhorst v. Iowa State Highway Comm'n*, 202 N.W.2d 38, 41 (Iowa 1972). The power of the agency is limited to the power granted by statute. *Id.* at 40; *see also Holland v. State*, 115 N.W.2d 161, 163–64 (Iowa 1962). Likewise, a court may not ignore the clear language of a statute and impose its own ideas through the guise of construction, even if it is the best way to promote public welfare and achieve a desirable result. *Holland*, 115 N.W.2d at 164.

**E. Discussion.**

1. *Straightforward interpretation of legislative language.* A straightforward reading of the language of Iowa Code section 484C.12 supports the Brakkes' position. The term "quarantine" cannot be wrenched from the statutory language that follows it. The term "quarantine" is modified by the phrase "of diseased preserve whitetail." *See* Iowa Code § 484C.12(1). It does not allow for quarantine of nondiseased whitetail or whitetail that are not preserve whitetail.

The DNR argues the natural and logical reading would produce absurd results. The question arises whether the absurdity doctrine should be invoked here to support the DNR's administrative rule and the DNR emergency order upon which it is based.

2. *Overview of the doctrine of absurdity.* The doctrine of absurdity has a good pedigree. Sutherland Statutory Construction, for instance, notes that ordinarily, ambiguous statutory language should be construed

in a fashion that produces a reasonable result. 2A Norman J. Singer & Shambie Singer, *Statutes & Statutory Construction* § 45:12, at 104–06 (7th ed. rev. 2014) [hereinafter Statutory Construction]. But Sutherland goes further. According to Sutherland, courts may use a "variant of the 'reasonableness' rule even absent ambiguity . . . when an act's plain, clear, literal meaning produces an unintended, absurd result." *Id.* at 115. Sutherland instructs that courts find it "fundamental" that departure from a literal construction is justified "when such a construction would produce an 'unreasonable' or 'absurd' or 'unworkable' or 'unjust' or 'unlikely' result clearly inconsistent with the purposes and policies of the act in question." *Id.* at 115–19 (footnotes omitted).

It is important at the outset to distinguish between interpreting ambiguous statutes to avoid absurd results and declining to enforce the literal terms of a statute to avoid absurdity. It is universally accepted that where statutory terms are ambiguous, courts should interpret the statute in a reasonable fashion to avoid absurd results. *See id.* § 46:7, at 279 ("All courts apparently agree that a finding of ambiguity opens statutory construction to the full range of familiar, interpretive tools.").

The true absurdity doctrine involves a different scenario. Under the absurdity doctrine, a court declines to follow the literal terms of the statute to avoid absurd results. *See id.* § 45:12, at 115. As noted by Sutherland, this is a different question from how courts proceed upon a finding of ambiguity. *Id.* Here is where the absurdity doctrine becomes controversial. To what extent may a court evade or ignore the literal terms of a statute to avoid a result that is not simply poor public policy, but is so unreasonable that it could not have been intended by the

legislature and reflects the inherent limit of the legislative process to foresee various applications of a statute?

3. *Caselaw from other jurisdictions applying absurdity doctrine.* The cases of the United States Supreme Court have oscillated between a textual approach that hews to a close parsing of legislative texts and a more purposeful approach to the construction of statutes.

Support for the absurdity doctrine goes back as far as 1868. In *United States v. Kirby,* the Supreme Court had occasion to ponder the absurdity doctrine. 74 U.S. 482, 486 (1868). In that case, a statute made it a crime to " 'knowing[ly] and wil[l]fully' obstruct or retard the passage of the mail." *Id.* at 485. The question was whether a law enforcement officer who arrested a mail carrier for murder violated the statute. *Id.* at 487. The *Kirby* Court said no. *Id.* It cited the Enlightenment philosopher Puffendorf, who concluded that a law stating "whoever drew blood in the streets should be punished with the utmost severity" did not apply to a surgeon who was trying to perform therapeutic bloodletting on a person who fell down in the street in a fit. *Id.*; *see* David M. Sollors, *The War on Error: The Scrivener's Error Doctrine and Textual Criticism: Confronting Errors in Statutes and Literary Texts*, 49 Santa Clara L. Rev. 459, 463 n.19 (2009) (noting the *Kirby* Court was referencing the work of the German jurist Samuel von Pufendorf). The Court also cited an Edwardian example that a prisoner is not guilty of escape when the prisoner breaks out of a prison on fire. *Kirby*, 74 U.S. at 487. *Kirby* and the examples it cites stand for the proposition that a *broadly worded and apparently unqualified statute may be narrowly* construed to avoid absurd results notwithstanding the literal terms of the statute.

The Supreme Court considered another departure from the literal terms of a statute in *Holy Trinity Church v. United States*, 143 U.S. 457, 12 S. Ct. 511 (1892). In *Holy Trinity*, the Supreme Court considered whether a statute that on its face prohibited importation of foreigners into the United States "to perform labor or service of any kind" applied to a church who hired an English rector. *Id.* at 458, 12 S. Ct. at 511. The statutory language was unqualified. *Id.* Yet, the Supreme Court held the statute did not apply to the hiring of the rector. *Id.* at 465, 12 S. Ct. at 514. The Court's refusal to apply the statute to the transaction was particularly striking as the statute contained a specific exception for "actors, artists, lecturers, singers, and domestic servants" but did not include clergy in the exception. *Id.* at 458–59, 12 S. Ct. at 512. The Court recognized the linguistic argument had "great force," yet stated that "we cannot think congress intended to denounce" the hiring of a religious rector. *Id.* at 459, 12 S. Ct. at 512. The Court declared the purpose of the statute was to prevent the influx of "cheap, unskilled labor." *Id.* at 464, 12 S. Ct. at 513. Further, the Court declared that a purpose against religion could not be imputed to the legislation. *Id.* at 465, 12 S. Ct. at 514.

The Supreme Court revisited the absurdity doctrine in *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 109 S. Ct. 2558 (1989). The question in that case was whether the Federal Advisory Committee Act applied to the justice department's solicitation of the views of committees of the American Bar Association on various judicial nominees. *Id.* at 443, 109 S. Ct. at 2561. The literal terms of the statute would have drawn within its scope any group of two or more persons who advised the President or the executive branch. *Id.* at 452, 109 S. Ct. at 2566. Justice Brennan, writing for the Court, declared this

result was not the intention of Congress as it would prevent political actors from the freedom to conduct their affairs. *Id.* at 453, 109 S. Ct. at 2566. In escaping the literal words of the statute, Justice Brennan cited Learned Hand, who once wrote, "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *Id.* at 454, 109 S. Ct. at 2567 (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404, 66 S. Ct. 193 (1945)).

In a concurring opinion, Justice Kennedy presented a narrower version of the absurdity doctrine. *Id.* at 470–71, 109 S. Ct. at 2575 (Kennedy, J., concurring). According to Justice Kennedy, the plain words of a statute could be avoided only if the literal interpretation would lead to "patently absurd consequences" under circumstances where "it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone." *Id.* (quoting *United States v. Brown*, 333 U.S. 18, 27, 68 S. Ct. 376, 380 (1948)); *see* Glen Staszewski, *Avoiding Absurdity*, 81 Ind. L.J. 1001, 1047 (2006) [hereinafter Staszewski].

Finally, although not labeled as the absurdity doctrine, the Supreme Court applied concepts similar to it in *King v. Burwell*, 576 U.S. ___, 135 S. Ct. 2480 (2015). In the Affordable Care Act, the meaning of the phrase "an Exchange established by the State under [42 U.S.C. § 18031]" was not particularly ambiguous, at least on its face. *Id.* at ___, ___, 135 S. Ct. at 2482, 2489. The term "by the State" does not seem to include by "the Federal Government." *Id.* at ___, 135 S. Ct. at 2490. As noted by Chief Justice Roberts, "Petitioners' arguments about the plain meaning of [the section] are strong." *Id.* at ___, 135 S. Ct. at 2495. Yet, Chief Justice Roberts concluded the narrow and specific phrase should be read more broadly to include any exchange under the Act, *including*

those established by the Federal Government.  *Id.* at ___, 135 S. Ct. at 2496.  The Chief Justice noted that the purpose of the Affordable Care Act was to improve the health insurance markets, not to destroy them.  *Id.*

In *King*—unlike in *Kirby, Holy Trinity*, and *Public Citizen* where the broad terms of a statute were narrowly construed—the meaning of the statute was seemingly expanded beyond its literal meaning to save the statute from self-destruction.  *See id.*  The compelling gist of *King* is that statutes do not commit suicide.  *King* thus amounted to a recognition that although "the plain language interpretation of a statute enjoys a robust presumption in its favor, it is also true that [a legislative body] cannot, in every instance, be counted on to have said what it meant or to have meant what it said."  *FBI v. Abramson*, 456 U.S. 615, 638, 102 S. Ct. 2054, 2068 (O'Connor, J., dissenting) (footnote omitted).

A factor pulsating through some federal absurdity cases is the desire to avoid constitutional conflict.  *Holy Trinity* at least implies that the application of the statute to the hiring of the rector might raise First Amendment issues, *see* 143 U.S. at 465, 12 S. Ct. at 514, and the *Public Citizen* majority discusses the need of the executive branch to engage in meaningful political communications free from public disclosure, *see* 491 U.S. at 453, 109 S. Ct. at 2566 (majority opinion).  As noted by one appellate court, when the statute's plain meaning is absurd, and perhaps unconstitutional, resort to extrinsic materials is appropriate.  *United States v. Romero-Bustamente*, 337 F.3d 1104, 1109 (9th Cir. 2003).  This tendency is supported by the notion that if the legislative branch wishes to trench on constitutional rights or separation of powers, it must do so only with the clearest of intentions.  Such an approach tends to use less confrontational statutory construction as a tool to strengthen

underenforced constitutional norms. *See* Staszewski, 81 Ind. L.J. at 1045.

As noted in commentary, although application of the absurdity principle is contested in federal courts, even those who advocate textual or literal approaches endorse the principle in at least some contexts. *See* Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 Am. U. L. Rev. 127, 128 & n.6 (1994) [hereinafter Dougherty]. For instance, in *Green v. Bock Laundry Machine Co.*, staunch textualist Justice Scalia rejected literal interpretation of Federal Rule of Evidence 609(a)(1) because it would produce absurd results. 490 U.S. 504, 527, 109 S. Ct. 1981, 1994 (Scalia, J., concurring); *see* Doughtery, 44 Am. U. L. Rev. at 153–58. Similarly, Judge Easterbrook has written that the language of a statute may be bent only when the text produces absurd results. *Neal v. Honeywell Inc.*, 33 F.3d 860, 862 (7th Cir. 1994), *abrogated by Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415, 125 S. Ct. 2444, 2449 (2005); *see* Doughtery, 44 Am. U. L. Rev. at 128 n.6. As noted by Judge Posner, even interpretive literalists realize that "the interpreter is free (we would say compelled) to depart in the direction of sense" where strict interpretation would yield absurd results. *Cent. States, S.E. & S.W. Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1345 (7th Cir. 1992).

There is caselaw in many states that supports some form of the absurdity doctrine. *See, e.g., Brock v. Townsell*, 309 S.W.3d 179, 186 (Ark. 2009); *Prof'l Collection Consultants v. Lauron*, 214 Cal. Rptr. 3d 419, 433 (Ct. App. 2017); *People v. Johnson*, ___ N.E.3d ___, ___, 2017 WL 243396, at *3 (Ill. 2017); *Cmty. Consol. Sch. Dist. No. 210 v. Mini*, 304 N.E.2d 75, 78 (Ill. 1973); *Commonwealth v. Peterson*, 65 N.E.3d 1166,

1169 (Mass. 2017); *State ex rel. Z.C.*, 165 P.3d 1206, 1209 (Utah 2007). Many of the cases, no doubt, are really cases of ambiguity and the avoidance of unreasonable results is a conventional interpretive strategy. But this is not always true. As noted by the Hawaii Supreme Court, "departure from literal construction is justified when such construction would produce an absurd and unjust result," clearly inconsistent with the purposes of the statute. *Pac. Ins. v. Or. Auto. Ins.*, 490 P.2d 899, 901 (Haw. 1971). There are many state court cases utilizing the absurdity doctrine when the plain meaning of the language does not seem ambiguous, some of which are quite remarkable. *See, e.g., Maddox v. State*, 923 So. 2d 442, 445, 448 (Fla. 2006) (holding statute prohibiting introduction of traffic citations "in any trial" limited to any trial dealing directly with the traffic offense); *Commonwealth v. Wallace*, 730 N.E.2d 275, 278 (Mass. 2000) (interpreting the phrase "trial on the merits" to include a default judgment); *State v. Spencer*, 173 S.E.2d 765, 774 (N.C. 1970) (finding "standing" in the street obstructing traffic includes walking in the street); *In re Falstaff Brewing Co. re: Narragansett Brewery Fire*, 637 A.2d 1047, 1050 (R.I. 1994) (holding statute authorizing release of "name and address" of juvenile also authorizes release of underlying record).

If anything, the case for the absurdity doctrine may well be stronger in state courts than in federal courts. State legislatures generally meet on a part-time basis. They do not generally employ the mechanisms of extensive public hearings, markups, and staff review that have characterized congressional action in the past. Further, large volumes of state legislation are often passed in the waning hours of a legislative session, with a flurry of last minute amendments, thus

increasing the possibility that legislation may be passed without a full linguistic vetting.

4. *Iowa caselaw regarding absurdity.* Some of our cases invoke the absurdity principle primarily as a tool of statutory interpretation. *See Mall Real Estate, L.L.C. v. City of Hamburg,* 818 N.W.2d 190, 199 (Iowa 2012). The use of interpretive tools to determine which of a number of textually plausible options the court should choose is not really application of the absurdity doctrine, but represents a conventional approach endorsed even by textualist opponents of the absurdity doctrine. *See* John F. Manning, *The Absurdity Doctrine,* 116 Harv. L. Rev. 2387, 2419–20 & nn.122–23. A recent survey in the Drake Law Review demonstrates that members of this court frequently look beyond the text of the statute in the interpretation of statutes. Karen L. Wallace, *Does the Past Predict the Future?: An Empirical Analysis of Recent Iowa Supreme Court Use of Legislative History as a Window into Statutory Construction in Iowa,* 63 Drake L. Rev. 239, 266–67 (2015) ("The court has exhibited a willingness to consider a wide range of sources that might help it interpret a statute consistent with legislative intent.").

As an apparent response to suggestions that we cannot use tools of construction to depart from clear legislative text, we have sometimes utilized a circular work-around in which we declare that if the statute produces absurd results, it must be "ambiguous." *See Sherwin-Williams Co. v. Iowa Dep't of Revenue,* 789 N.W.2d 417, 427 & n.8 (Iowa 2010). But it is doubtful that a clear text is really transformed into an ambiguous one solely based on the consequences of application. In cases where we employ circular ambiguity, we are really applying the true absurdity doctrine, namely, overriding the text of a statute to avoid

an intolerable result, just as the United States Supreme Court did in *Kirby, Holy Trinity*, and *Public Citizen*, and just as many other state courts have done over the decades.

A more straightforward description of the absurdity doctrine was presented in *Case v. Olsen*, where we declared,

> The court should give effect to the spirit of the law rather than the letter, especially so where adherence to the letter would result in absurdity, or injustice, or would lead to contradiction, or would defeat the plain purpose of the act, or where the provision was inserted through inadvertence.

234 Iowa 869, 873, 14 N.W.2d 717, 719 (1944). *Kirby, Holy Trinity*, and *Public Citizen* utilize what one scholar has called "specific absurdity." *See* Linda D. Jellum, *Why Specific Absurdity Undermines Textualism*, 76 Brook. L. Rev. 917, 929 (2011). Specific absurdity is when the literal terms of a broadly framed statue have been narrowed to avoid an absurd result in specific instances. *Id.* at 928.

We have engaged in a specific absurdity analysis on a number of occasions. For instance, in *State v. Hoyman*, we invoked the absurdity doctrine to narrow the scope of a statute that criminalized fraudulent practices in the context of public records. 863 N.W.2d 1, 14 (Iowa 2015). The statutory language seemed to criminalize any knowingly incorrect entry, regardless of significance and whether the maker intended to deceive. *Id.* at 8. We concluded that when read literally, the scope of the statute "would be breathtakingly broad." *Id.* at 13. We thus interpreted the term "false" in the statute to mean that the entry was made with intent to deceive. *Id.* at 15. We thus used the absurdity doctrine to narrow the scope of a criminal statute.

Similarly, in *Bearinger v. Iowa Department of Transportation*, we considered whether a driver could invoke a prescription-drug defense

before an administrative tribunal seeking to revoke her driver's license. 844 N.W.2d 104, 106 (2014). We noted that in criminal matters, the legislature expressly provided for a prescription-drug defense. *Id.* at 107–08. Yet, a similar defense was not provided for in the administrative process related to license revocation. *Id.* at 109. Under the driver's license revocation statute, revocation could occur when "*any amount of a controlled substance is present in the person.*" *Id.* at 107 (quoting Iowa Code § 321J.2(1)(*c*) (emphasis added)). In order to avoid absurd results, we narrowed the scope of the term "any amount" to exclude amounts in the body as a result of duly prescribed and ingested prescription drugs. *Id.* at 110.

Finally, in *Iowa Insurance Institute v. Core Group of Iowa Association for Justice*, we construed the term "all information" to exclude work product, attorney work product, attorney–client, and other privileged materials. 867 N.W.2d 58, 79 (2015). The literal terms of the statute did not have any qualification. *Id.* at 69. We declared "all information" to be ambiguous, but the language was plain enough. *Id.* at 73. We narrowed the statute to avoid untoward results. *Id.* at 76.

In this case, however, we are not asked to narrow the scope of a statute, but to expand the scope beyond its plain meaning. This is the scenario presented in *King*, 576 U.S. ___, 135 S. Ct. 2480. We have, on occasion, expanded the meaning of a statute through interpretation in order to avoid an absurd result. *See Hutchison v. Shull*, 878 N.W.2d 221, 233 (Iowa 2016) (favoring expansive interpretation of the term "meeting" to promote underlying goals of statute); *Mall Real Estate*, 818 N.W.2d at 199 (applying expansive interpretation of the term "material" to achieve statutory consistency). Nonetheless, it seems fair to say avoiding the

literal terms of a statute in order to extend the power of the state occurs with less frequency than a narrowing construction.

We also seem to have recognized that statutes should not contain the seeds of their own destruction. For instance, we have stated that "when a literal interpretation of a statute results in absurd consequences that undermine the clear purpose of the statute, an ambiguity arises." *Sherwin-Williams*, 789 N.W.2d at 427 n.8; *see also State v. Hopkins*, 465 N.W.2d 894, 896 (Iowa 1991) (noting we strive to arrive at a construction that will best effectuate its purpose rather than defeat it); *Crow v. Shaeffer*, 199 N.W.2d 45, 47 (Iowa 1972). In a similar vein, our older cases have recognized what some have called the common law equity or "spirit" of the statute. *Case*, 234 Iowa at 873, 14 N.W.2d at 719. Our invocation of the spirit of the statute is usually in conjunction with a finding that the statute is ambiguous. *See id.* at 872, 14 N.W.2d at 719.

We have also recognized narrow construction to avoid constitutional problems. *State v. McGuire*, 200 N.W.2d 832, 833 (Iowa 1972); *Carroll v. City of Cedar Falls*, 221 Iowa 277, 283–84, 261 N.W. 652, 655–56 (1935). A possible unconstitutional result is a factor that might tip statutory interpretation away from a literal reading of the statute.

In the end, we find the teaching of *Sherwin-Williams* is consistent with the vast majority of state and federal law and has continued vitality today. In *Sherwin-Williams*, we noted that "the absurd results doctrine should be used sparingly because it entails the risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could not have meant what it unmistakably said." 789 N.W.2d at 427 (quoting 2A Statutory Construction § 45:12, at 105–07

(7th ed. 2007)). Yet, in *Sherwin-Williams*, we also cited with approval a Hawaii case which states,

> [E]ven in the absence of statutory ambiguity, departure from literal construction is justified when such construction would produce an absurd and unjust result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.

*Id.* (alteration in original) (quoting *Pac. Ins.*, 490 P.2d at 901).

The bottom line is that the absurdity doctrine is well established in Iowa and elsewhere, though not always clearly articulated. It can be utilized, in rare cases, to overcome the plain meaning of the words of a statute. The doctrine, however, must be used sparingly and only in circumstances when the court is confident the legislature did not intend the result required by literal application of the statutory terms.

5. *Discussion of applying the absurdity doctrine in this case.* In light of these cases, we now turn to considering the meaning of Iowa Code section 484C.12. It expressly authorizes the DNR to engage in quarantine of "diseased preserve whitetail." Iowa Code § 484C.12. There does not seem to be a lot of ambiguity here. The quarantine applies only if three requirements are present: diseased, preserve, and whitetail. *Id.* It would be a blue-is-red-type of interpretation to claim that the statute applies to nondiseased whitetail. And, the quarantine applies to whitetail, not to land.

We could, perhaps, escape the plain meaning of the words through an application of the absurdity principle. That is the fighting issue in this case. The DNR seeks through the absurdity doctrine to broaden inclusion of coverage. It is then akin to *King*, 576 U.S. at ___, 135 S. Ct. at 2496. The DNR seeks to release itself from the verbal chains of the

statute to achieve what it views as a better, more thorough, and more comprehensive result.

But we do not see absurdity here. Indeed, it is not uncommon that the legislative process results in half measures. Further, the plain meaning of the statute, namely that quarantine applies only to "diseased preserve whitetail," is not absurd. The DNR itself admits that a quarantine of the diseased animals is one step in a program of control of CWD. The record in this case established that CWD is of great concern in the game-hunting community, but there seems to be no clear consensus about the efficacy of various eradication efforts. After reviewing the record in this case, one does not emerge thinking, "Oh my gosh, that can't be!" when considering the plain legislative language.

The linguistic focus in the Iowa statute on the animals rather than the land is found in other CWD regulatory regimes. For example, Illinois law authorizes a quarantine of a CWD-infected herd until

> either the herd has been depopulated or there has been no evidence of CWD in the herd for five years from the date of the last case, and all animals that have died, been euthanized or been slaughtered in the herd during that period were examined for CWD.

Ill. Admin. Code tit. 8, § 85.120(e)(2) (Westlaw current through Ill. Reg. vol. 41, issue 21). There is no provision for quarantine after the herd has been depopulated.

We further note that at the time Iowa Code chapter 484C was enacted, there were other legislative models that distinguished between quarantine of animals and quarantine of land. For example, the North Carolina statute expressly authorizes the quarantine of exposed animals and affected premises within the state. N.C. Gen. Stat. § 106-401 (West, Westlaw current through S.L. 2017-17 of the 2017 Reg. Sess.). Section

(a) of the statute authorizes the state veterinarian to "quarantine any animal affected with or exposed to a contagious disease." *Id.* § 106-401(a). Under this provision, the quarantine remains in effect "until any sick or diseased animal has been properly disposed of and the premises have been properly cleaned and disinfected." *Id.* Section (b) authorizes the state veterinarian, in consultation with the commissioner of agriculture and with approval of the governor, to quarantine "areas within the State." *Id.* § 106-401(b); *see* Andrew H. Nelson, *High Stakes: Defending North Carolina's Response to Contagious Animal Diseases*, 83 N.C. L. Rev. 238, 263–71 (2004). Further, a survey of administrative regulations related to CWD for cervids shows that some do not expressly authorize quarantines, some authorize quarantines but only of herds, and some authorize quarantines of both herds and premises. *See, e.g.,* Ariz. Admin. Code § R3-2-405 (Westlaw current through Ariz. Admin. Reg. vol. 23, issue (7)) (providing for depopulation of animals exposed to CWD but no mention of a quarantine); Kan. Admin. Regs. 9-3-17(a) (Westlaw current through Vol. 36, No. 17, Apr. 27, 2017) (authorizing a "herd quarantine"); 2-4 Vt. Code R. § 316:XI (Westlaw current through May 2017) (providing for a quarantine of herd and premises). We decline to write a passage related to quarantine of the premises into the Iowa law, which authorizes only the quarantine of animals. *See* Iowa Code § 484C.12.

The fact that more might have been done does not make the grant of limited authority the legislature gave to the DNR absurd. Our task is to interpret the statute, not improve it. *See Wells Fargo Bank v. Super. Ct.,* 811 P.2d 1025, 1034 (Cal. 1991) (en banc); *In re Matthew D.,* 880 N.W.2d 107, 114 (Wis. 2016). Indeed, while more might need to be done in a specific case, the legislature may well have relied on Iowa Code

section 484C.12(2), which requires the landowner, or the landowner's veterinarian, and a DNR epidemiologist to develop a plan for eradicating the disease among the preserve whitetail population. This provision suggests a reliance on mutual agreement on a case-by-case basis for further remedies, rather than the expansive government quarantine authority suggested by the DNR.

We also observe some of the features that may tend to support application of the absurdity doctrine are not present in this case. We note that the DNR asks us to expand, rather than retract, government power. While we have on occasion done so in the past under the absurdity doctrine, we think it is a more difficult argument to make than when a statute is narrowed. If the legislature wants to assert new regulatory powers over private landowners, it should do so expressly. Further, to the extent there are constitutional issues at stake here, they cut against a broad interpretation of the statute in light of the property interests of deer farmers.

**F. Conclusion.** We therefore conclude that Iowa Code section 484C.12 should be read according to its ordinary meaning. The consequence of this interpretation is that the agency lacked the statutory authority to promulgate the administrative rule expanding the scope of quarantines to include fencing of lands for a five-year period when all diseased preserve wildlife have been eradicated. As a result, the agency was without authority to issue the emergency order in this case.[4] If the

---

[4]Like the district court, we decline to consider whether the DNR or NRC is entitled to deference in the interpretation of the statute under *Renda*, 784 N.W.2d at 11–14. Even if deference were afforded, we would nonetheless rule the DNR was without authority to issue the emergency order in this case.

legislature wishes to expand quarantine powers as suggested by the DNR rule, it is, of course, free to do so.

### IV. Taking Under the Due Process Clauses of the United States or Iowa Constitutions.

**A. Introduction.** Under both the United States and Iowa Constitutions, the government is required to pay just compensation when it "takes" private property for public use. U.S. Const. amend. V; Iowa Const. art. I, § 18. The overarching purpose of the Takings Clause of the United States Constitution is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Yancey v. United States*, 915 F.2d 1534, 1539 (Fed. Cir. 1990) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960)).

The United States Supreme Court has recognized two different types of takings. The first type involves direct government seizure of property that amounts to "a practical ouster of [the owner's] possession." *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 537, 125 S. Ct. 2074, 2081 (2005) (alteration in original) (quoting *Lucas v. S. Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S. Ct. 2886, 2892 (1992)). The Supreme Court, however, has recognized a second kind of taking which occurs as a result of government regulation which becomes sufficiently onerous that "its effect is tantamount to a direct appropriation or ouster." *Id.*

In their cross-appeal in this case, the Brakkes assert the district court erred in not finding the emergency order amounted to a regulatory taking under the United States and Iowa Constitutions that entitled them to just compensation.

**B. Constitutional Provisions.** The Takings Clause of the Fifth Amendment of the United States Constitution provides that "private property shall not be taken for public use, without just compensation." U.S. Const. amend. V. Article I, section 18 of the Iowa Constitution provides that "[p]rivate property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury." Iowa Const. art. I, § 18.

The Brakkes do not assert that the standard on takings under the Iowa Constitution is different than that under the federal takings constitutional counterpart. We therefore apply the established federal standards regarding takings, but reserve the right to apply these standards in a fashion different than the federal courts. *State v. Kooima,* 833 N.W.2d 202, 206 (Iowa 2013); *Racing Ass'n of Cent. Iowa v. Fitzgerald,* 675 N.W.2d 1, 5 (Iowa 2004).

**C. Positions of the Parties.** Citing federal caselaw, the Brakkes point out that regulatory takings occur when the government (1) requires the owner to suffer a permanent physical invasion, no matter how minor; (2) completely deprives the owner of all economically beneficial use of her property; or (3) without sufficient justification requires an owner to dedicate a portion of property in exchange for a building permit. *See Lingle,* 544 U.S. at 538, 125 S. Ct. at 2081 (describing the first two types of takings as "per se regulatory takings"); *Dolan v. City of Tigard,* 512 U.S. 374, 388, 114 S. Ct. 2309, 2318 (1994) (involving permit conditions imposed on property owner). A taking may also occur when the balancing factors of *Penn Central Transportation Co. v. City of New York* indicate a taking has occurred. 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978). The factors to be balanced under the familiar *Penn Central* test

are (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interfered with distinct investment-backed expectations, and (3) the character of the government action. *Id.*

The Brakkes argue the emergency order was a per se regulatory taking because the order required the Brakkes to maintain both the fence and the gates at Pine Ridge. In support of their argument, the Brakkes cite *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982). In *Loretto*, a landlord was forced to allow a cable television company to install cable and connection boxes on her property. *Id.* at 421–22, 102 S. Ct. at 3168–69. The United States Supreme Court found a permanent physical occupation of real property that amounted to compensable taking. *Id.* at 438, 102 S. Ct. at 3177. In addition to the requirement to maintain the fence and gate, the Brakkes note the emergency order authorized the DNR to physically invade their property to kill wild deer. Further, the Brakkes observe that any future operational plan would necessarily prohibit the Brakkes from excluding DNR personnel and property. These physical invasions, according to the Brakkes, are takings that entitle them to just compensation.

The Brakkes recognize the DNR's physical invasions are not permanent. Nonetheless, the Brakkes point to two World War II era cases where the government's condemnation of company premises amounted to compensable takings despite the temporary nature. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S. Ct. 1434, 1438 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372, 375–76, 66 S. Ct. 596, 598–99 (1946). The Brakkes cite a recent case, *Arkansas Game & Fish Commission v. United States*, which suggests that government-induced flooding may be compensable. 568 U.S. 23, ___, 133 S. Ct. 511, 519–20 (2012).

The Brakkes also argue that the emergency order is a regulatory taking because it is the functional equivalent of ousting the Brakkes from their property for a five-year period, or at least as long as the emergency order is in place. According to the Brakkes, the emergency order hollows out its right to "possess, use and dispose" of their property. *Loretto*, 458 U.S. 419, 435, 102 S. Ct. at 3176. The Brakkes repeat that the emergency order forces them to maintain the fence, precludes them from conducting hunting on the property, and requires them to submit an operational plan that will effectively permit the DNR to control all activities at all times during the five-year quarantine. According to the Brakkes, they cannot sell their property to escape the tentacles of the DNR because the DNR restrictions will scare away potential buyers.

Next, the Brakkes argue the emergency order qualifies as a taking because it strips the property of all economically beneficial use. The Brakkes point to *Lucas*, in which the Supreme Court stated that a property owner called upon "to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, . . . has suffered a taking." 505 U.S. at 1019, 112 S. Ct. at 2895. According to the Brakkes, the record in this case demonstrates there is no other use of the land other than as a hunting preserve, which the DNR order prohibits.

Finally, and because it satisfies the *Penn Central* test, the Brakkes assert the economic impact of the emergency order has been extensive, the regulation has interfered with their investment-based expectations, and the order was a product of political considerations and not the law. *See* 438 U.S. at 124, 98 S. Ct. at 2659. According to the Brakkes, the district court erred by declining to find a taking under *Penn Central*.

The DNR focuses its response on the question of whether a compensable taking occurred. With respect to the per se regulatory takings, the DNR asserts the record did not establish a permanent physical invasion and did not deprive the Brakkes of all economic benefit.

On the question of permanent physical invasion, the DNR emphasizes a parade of federal caselaw that stress physical invasions must be permanent, and not temporary, to be per se compensable under the Takings Clause. In particular, the DNR notes that in *Loretto*, the United States Supreme Court expressly distinguished between permanent and temporary invasions and held that a per se taking was present only when an invasion was permanent. 458 U.S. at 432–35, 102 S. Ct. at 3174–75. The DNR recognizes that the World War II era cases of *Kimball* and *Petty Motor* allow for compensation for temporary takings, but the DNR suggests that later caselaw has clarified that in order to be a per se taking under current doctrine, the taking must be permanent. *Loretto*, 458 U.S. at 435, 102 S. Ct. at 3175.

The DNR next addresses the question of whether the emergency order amounted to a per se taking because it deprived the Brakkes of all productive use of the hunting preserve. Citing *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, the DNR asserts that in order to be a per se taking under this theory, the government action must deprive the property owner of "all economically beneficial use." 535 U.S. 302, 319, 122 S. Ct. 1465, 1477 (2002). In *Tahoe-Sierra*, the Supreme Court held that a moratorium on development of property for thirty-two months did not create a per se taking. *Id.* at 306, 321, 122 S. Ct. at 1470, 1478. DNR argues that *Tahoe-Sierra* recognizes that anything less than a complete elimination of value or total loss must be

analyzed under *Penn Central* and cannot be treated as per se takings. *See id.* at 321, 122 S. Ct. at 1478. The DNR notes that according to the United States Supreme Court, such a finding that "all economically beneficial use[]" has been eliminated as a result of government action is "relatively rare." *Lucas*, 505 U.S. at 1018, 112 S. Ct. at 2894.

The DNR argues that the Brakkes fail to show a deprivation of "all economically beneficial use" for two reasons. First, the DNR notes that a temporary taking is insufficient. In addition, the DNR points out that even on a temporary basis, the Brakkes have not been deprived of all economic interests, as the property can still be used for noncervid species, fishing, row crops, hay ground, timber harvest, bed and breakfast, or cattle pasture, among other uses. The DNR also points to an appraisal, which indicated the value of the Brakkes' property due to the DNR's regulatory effort fell from $1,056,000 to $891,000.

Having argued that the Brakkes failed to show a per se taking, the DNR turns to the question of whether the emergency order amounted to a regulatory taking under *Penn Central.* The DNR asserts that under the first *Penn Central* factor, the Brakkes failed to show the economic impact of the emergency order weighed in favor of finding a taking. The DNR stresses the relatively small diminution in the value of the property and the fact the diminution in value will abate as the end of the quarantine period approaches. According to the DNR, in order for the economic impact to weigh in favor of a taking, the diminution in value has to be much greater, at least by fifty percent or more. *See CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (stating it was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent"). To the extent the Brakkes claimed lost profits was the proper measure of economic impact, the DNR cited

cases standing for the proposition that consequential damages are not recoverable in takings cases and thus should not be the standard for determining if a taking occurred. *See, e.g., Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 6–7 (Iowa 2001).

Under the second *Penn Central* factor, the DNR suggests that investment-backed expectations do not weigh in favor of a taking. The DNR argues the Brakkes knew that hunting reserves were subject to regulation. The DNR notes that for purposes of considering investment-backed expectation, the test is not whether a specific government regulation existed at the time of investment, but "[t]he critical question is whether extension of existing law could be foreseen as reasonably possible." *Cienega Gardens v. United States*, 503 F.3d 1266, 1288–89 (Fed. Cir. 2007) (quoting *Commw. Edison Co. v. United States*, 271 F.3d 1327, 1357 (Fed. Cir. 2001) (en banc)).

On the last *Penn Central* factor, the DNR argues that the character of the government action does not weigh in favor of a taking. The DNR points out that the Brakkes maintained possession of their property and maintained the right to possess, lease, or sell the property. The DNR points to the beneficent purpose of the regulation, namely, to prevent the spread of CWD. Finally, the DNR argues the duration of the quarantine was relatively brief and the diminution in the property value was modest.

**D. Discussion.**

1. *Overview of regulatory takings theories.* The classic government taking requiring compensation is a direct appropriation of physical property, "or the functional equivalent of 'a practical ouster of [the owner's] possession.'" *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892 (alteration in original) (quoting *Transp. Co. v. Chicago*, 99 U.S. 635, 642 (1878)). A regulatory taking, on the other hand, occurs when a

regulation becomes so burdensome that its effect is "tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2081; *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922) (recognizing regulatory takings for the first time); *see also Easter Lake Estates, Inc. v. Polk County*, 444 N.W.2d 72, 75 (Iowa 1989) ("[G]overnment action that substantially deprives a person of the use of property, in whole or in part, may be a compensable taking."). This case focuses solely on regulatory takings.

As can be seen by the positions of the parties, there are three types of regulatory takings at play: (1) a per se taking arising from a permanent physical invasion of property, (2) a per se taking arising from regulation that denies the owner all economically beneficial ownership, and (3) a regulatory taking based on the balancing of the three *Penn Central* factors. *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 316 (Iowa 1998); *see* Craig A. Peterson, *Land Use Regulatory 'Takings' Revisited: The New Supreme Court Approaches*, 39 Hastings L.J. 335, 336–39 (1988) (sketching the development of the Court's regulatory takings caselaw since *Penn Central*).

2. *Merits of a per se takings claim involving "physical invasions of property" or deprivation of "all economically beneficial or productive use of land."* We begin with a review of the takings law involving physical invasions by government regulation. A key case is *Loretto*, 458 U.S. 419, 102 S. Ct. 3164. In *Loretto*, the owner of a New York City apartment building challenged a New York law requiring that landlords not interfere with the installation of cable television facilities on their premises, not demand payments from tenants for permitting cable television, and not demand payment from a cable television company in excess of an amount set by regulation. *Id.* at 423, 102 S. Ct. at 3169. The *Loretto*

Court noted that lower courts had found the law served a legitimate public purpose, but held that when there is a "permanent physical occupation authorized by government," the action is a taking whether or not it serves the public interest. *Id.* at 425–26, 102 S. Ct. at 3170–71.

The *Loretto* Court turned to the question of whether there was a permanent physical invasion under the facts presented. *Id.* at 438, 102 S. Ct. at 3177. The Court noted that landlords suffered a permanent physical occupation in the form of the plates, boxes, wires, and bolts that affix the cable television installment to the roof of the building. *Id.* Such a permanent installation on the landlord's property was, therefore, a taking. *Id.* at 438, 102 S. Ct. at 3178.

The concept that a regulation that deprived a property owner "of all economically beneficial or productive use" amounted to a per se taking was explored in *Lucas,* 505 U.S. at 1015, 112 S. Ct. at 2893. In *Lucas,* a land developer purchased coastal property intending to develop single-family residences. *Id.* at 1008, 112 S. Ct. at 2889. A coastal council, however, prohibited construction of any habitable improvements on the property. *Id.* The land developer sought compensation, arguing the regulation, though enacted pursuant to a valid law, was a taking because it denied him all economically beneficial or productive use of the land. *Id.* at 1009, 112 S. Ct. at 2890.

The *Lucas* Court recognized that a compensable taking occurs when a regulation "denies an owner of all economically viable use of his land." *Id.* at 1016, 112 S. Ct. at 2894 (quoting *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S. Ct. 2138, 2141 (1980), *abrogated on other grounds by Lingle,* 544 U.S. at 545, 125 S. Ct. at 2087). This position is justified, the Court explained, because from a landowner's point of view, being totally deprived of all of the beneficial use of the land is the

equivalent of a physical appropriation. *Id.* at 1017, 112 S. Ct. at 2894. While the government must be allowed to affect property values by regulation without compensation, the Court recognized that takings could occur under "the relatively rare situations where the government had deprived a landowner of all economically beneficial uses." *Id.* at 1018, 112 S. Ct. at 2894.

The Supreme Court considered the question of whether a temporary taking that for a period of time deprived the owner of all economic benefit could be a per se taking. In *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, the Supreme Court held for the first time that a landowner could recover damages for the temporary period during which a land-use regulation was effective. 482 U.S. 304, 322, 107 S. Ct. 2378, 2389 (1987).

In *First English*, the appellant church's campground was flooded and its buildings destroyed. 482 U.S. at 307, 107 S. Ct. at 2381. In response to the flood, the county adopted an interim ordinance that prohibited the construction or reconstruction of any building in an interim flood protection area, which included the campground. *Id.* at 307, 107 S. Ct. at 2381–82. There is no indication in the opinion of the stated duration of the "interim ordinance," if the ordinance in fact included a duration. *Id.* at 307, 107 S. Ct. at 2382.

The church brought a claim in California state court, arguing that the ordinance denied the church of all use of the campground and asking for just compensation. *Id.* at 308, 107 S. Ct. at 2382. The California courts rejected the claim under California precedent, which established the only remedy for an ordinance that deprived a landowner of the total use of their lands was declaratory relief or mandamus. *Id.* at 309, 107 S. Ct. at 2382. This California precedent held that compensation was

only available if a landowner had sought declaratory relief, the ordinance was held excessive, and the government persisted in enforcing the regulation. *Id.* The church appealed to the United States Supreme Court, arguing that temporary regulatory takings require just compensation under the Fifth Amendment. *Id.* at 310, 107 S. Ct. at 2383.

After a lengthy analysis of prior precedent, the Supreme Court found that where takings deny landowners all use of property, there is no real difference between temporary takings and permanent takings. *Id.* at 318, 107 S. Ct. at 2388 (" '[T]emporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation."); *see also San Diego Gas & Elec. Co.,* 450 U.S. 621, 657, 101 S. Ct. 1287, 1307 (Brennan, J., dissenting) ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable.").

The *First English* Court emphasized that its decision was limited to ordinances that deny the property owner all use of their property and not "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." 482 U.S. at 321, 107 S. Ct. at 2389. Additionally, the Court explained, once a determination has been made that a taking has occurred, the government retains the ability to choose to amend the regulation, withdraw the regulation, or exercise eminent domain. *Id.* But when the government has already taken all use of a property, it has a duty to provide compensation for the period during which the taking was effective. *Id.*

While *First English* seems to stand for the proposition that temporary government actions that eliminate all economically viable use of the property are subject to a Fifth Amendment per se taking analysis, the Court significantly narrowed the holding of *First English* in *Tahoe-Sierra*, 535 U.S. at 328–29, 122 S. Ct. at 1482. In *Tahoe-Sierra*, the Supreme Court considered a landowners group's challenge to a two-year, eight-month moratorium on new development around Lake Tahoe. *Id.* at 306, 122 S. Ct. at 1470. These moratoria were enacted so that land-use planners could develop a plan to preserve the lake while allowing new development. *Id.* at 310–11, 122 S. Ct. at 1472–73. The landowners claimed the moratoria were both per se takings and takings under the multifactored *Penn Central* approach. *Id.* at 314–15, 122 S. Ct. at 1474–75.

The district court had concluded the *Penn Central* factors were not met, but that under *First English*, 482 U.S. 304, 107 S. Ct. 2378, and *Lucas*, 505 U.S. 1003, 112 S. Ct. 2886, the landowners were entitled to compensation for the thirty-two months of the moratoria because they were temporarily deprived of all economically viable use of their land. *Tahoe-Sierra*, 535 U.S. at 316–17, 122 S. Ct. at 1475–76. When the parties appealed and cross-appealed, the landowners did not appeal the *Penn Central* issue. *Id.* at 317, 122 S. Ct. at 1476.

The *Tahoe-Sierra* Court rejected a categorical, per se rule that temporary deprivations of all viable economic uses of the land necessarily gives rise to a takings claim. *Id.* at 321, 122 S. Ct. at 1478. Instead, the Court stated temporary deprivations of use of property must be analyzed under the fact-specific *Penn Central* framework. *Id.* The *Tahoe-Sierra* Court distinguished *First English* by emphasizing that the issue in *First English* was not whether a taking had occurred, but only whether

compensation was required because the taking was temporary. *Id.* at 328, 122 S. Ct. at 1482; *see First English*, 482 U.S. at 321, 107 S. Ct. at 2389 ("We merely hold that where the government's activities have already worked a taking . . . ."). As a result, the *Tahoe-Sierra* Court stated *First English* did not stand for the proposition that a taking had occurred. 535 U.S. at 328, 122 S. Ct. at 1482. The Court also emphasized that *Lucas* did not support the petitioners because the statute in *Lucas* eliminating all value of the land was "unconditional and permanent," not temporary. *Id.* at 329, 122 S. Ct. at 1483 (quoting *Lucas*, 505 U.S. at 1012, 112 S. Ct. at 2891).

Based on the above authorities, we conclude the Brakkes have failed to establish a per se regulatory taking based on either a physical-invasion theory or an all economic-benefit theory. While the World War II vintage cases, buttressed by *First English*, might imply or suggest that a per se taking can arise from temporary takings, the more recent case of *Tahoe-Sierra* holds that temporary takings are not per se violations but are instead analyzed under the multifactor *Penn Central* test. *Id.* at 321, 122 S. Ct. at 1478. We therefore reject the Brakkes' per se takings claim and proceed to consider whether the Brakkes have a takings claim under the *Penn Central* test.

3. *Merits of a takings claim under a multifactored* Penn Central *balancing test.* *Penn Central* involved the application of New York City's landmark preservation law to the Grand Central Terminal. 438 U.S. at 115, 98 S. Ct. at 2654. Under the law, the owner of a piece of property designated as a landmark was required to maintain the building in a good state of repair and was prevented from altering the exterior of the building absent the approval of the Landmarks Preservation Commission. *Id.* at 111–12, 98 S. Ct. at 2653.

The *Penn Central* Court, in summarizing its Fifth Amendment jurisprudence, emphasized there is no "set formula" for determining when concerns of "justice and fairness" require a private property owner to be compensated for economic injuries caused by a public action. *Id.* at 124, 98 S. Ct. at 2659 (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S. Ct. 987, 990 (1960)). The Court emphasized that whether the government is required to pay just compensation depends "upon the particular circumstances [in that] case." *Id.* (alteration in original) (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168, 78 S. Ct. 1097, 1104 (1958)). According to the Court, the inquiry is ad hoc and fact specific. *Id.*

Nevertheless, the *Penn Central* Court identified several factors of "particular significance." *Id.*

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the government action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (citations omitted); *accord Fitzgarrald v. City of Iowa City*, 492 N.W.2d 659, 663 (Iowa 1992); *Iowa-Ill. Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 412 N.W.2d 600, 607 (Iowa 1987). Even when a regulation furthers important public policies, it may nevertheless "so frustrate distinct investment-backed expectations as to amount to a taking." *Penn Cent.*, 438 U.S. at 127, 98 S. Ct. at 2661; *see Penn. Coal*, 260 U.S. at 415, 43 S. Ct. at 160. A taking may be found if the regulation destroys the "primary expectation" of the owners of and investors in the parcel. *Penn Cent.*, 438 U.S. at 136, 98 S. Ct. at 2665; *see also Kasparek v.*

*Johnson Cty. Bd. of Health,* 288 N.W.2d 511, 518 (Iowa 1980) (emphasizing this element of *Penn Central*).

In *Kaiser Aetna v. United States,* the Court summarized the *Penn Central* factors as "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action." 444 U.S. 164, 175, 100 S. Ct. 383, 390 (1979); *accord Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25, 106 S. Ct. 1018, 1026 (1986). *Kaiser Aetna* and its progeny have given rise to descriptions of *Penn Central* as involving a three-part balancing test. *See* Adam R. Pomeroy, *Penn Central After 35 Years: A Three Part Balancing Test or a One Strike Rule?*, 22 Fed. Cir. B.J. 677, 677 (2013).

We, however, have generally considered the *Penn Central* test to be a two-part test, merging the first two factors described in *Kaiser Aetna*—

> (1) " '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[,]' " and (2) "the 'character of the government action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' "

*Harms,* 702 N.W.2d at 98 (alteration in original) (quoting *Lingle,* 544 U.S. at 539, 125 S. Ct. at 2082).

We now turn to apply the *Penn Central* test to the case before us. There is no doubt there has been an economic impact from the emergency order in this case. But the value of the land, as testified to by the DNR's expert, has declined only 16.4%, generally not enough to weigh heavily in support of finding a taking. *See CCA Assocs.,* 667 F.3d at 1246. Although the land cannot be used as a hunting preserve, it had value and other uses prior to becoming a hunting preserve and has value and other uses during the quarantine period.

While there is little doubt the Brakkes may have lost profits, the yardstick in a takings case is ordinarily lost value of the property taken. *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1268 (Fed. Cir. 2009). We have held that consequential damages are not recoverable in takings cases. *Kurth*, 628 N.W.2d at 6–7. We have further stated that "the profits of a business are too uncertain, and depend upon too many contingencies to safely be accepted as any evidence of the usable value of the property upon which the business is carried on." *Wilson v. Iowa State Highway Comm'n*, 249 Iowa 994, 1006, 90 N.W.2d 161, 169 (Iowa 1958). We conclude that claims of lost profits may be considered only as a factor in determining the lost value of the land which has allegedly been taken. *See Rose Acre*, 559 F.3d at 1272.

Based on the evidence, we find the economic harm simply does not weigh in favor of a taking under *Penn Central*. The *Penn Central* approach is designed to give government authorities fairly wide berth in the regulation in the public interest. *See* 438 U.S. at 144–45, 98 S. Ct. at 2669–70. The applicable caselaw does not support the Brakkes' assertion that the economic impact of the regulation on the Brakkes cuts in favor of the finding of a taking.

We now turn to the question of whether the DNR's action interfered with distinct investment-backed expectations. The investment-backed expectations test is an objective one. *Ciegna Gardens*, 331 F.3d at 1346. The Brakkes were in the business of operating a hunting preserve. A reasonable investor would be aware that hunting preserves are subject to state regulation, including regulation related to CWD. *See* Iowa Code ch. 484C; *see also Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 442 (8th Cir. 2007) (holding that investment-backed expectations did not weigh in favor of a taking in heavily regulated gambling industry).

Further, a reasonable investor would understand the presence of CWD in a hunting preserve could give rise to aggressive government action to curtail the spread of the disease. Notably, in *Kafka v. Montana Department of Fish, Wildlife, and Parks*, the Supreme Court of Montana noted that in considering investment-backed expectations in the context of a takings claim, "the regulated and speculative nature of a particular industry should be considered in determining whether investment-backed expectations are reasonable." 201 P.3d 8, 31 (Mont. 2008). The *Kafka* court concluded "appellants should have reasonably anticipated that the Game Farm industry might be phased out due to health and safety-related concerns over CWD." *Id.* at 32; *see also Buhmann v. State*, 201 P.3d 70, 94 (Mont. 2008) (noting dangers of CWD to deer and elk population were "publicly known and very controversial among many members of the public"); *see generally* Ronald W. Opsahl, *Chronic Wasting Disease of Deer and Elk, A Call for National Action*, 33 Envtl. L. 1059, 1061–62 (2003) (providing history of CWD including endemic presence in northeastern Colorado, southeastern Wyoming, and western Nebraska and presence in a number of other states).

As a result, we do not conclude the investment-backed expectations have been dramatically upset here. One of the downsides of entering a regulated field is that more intense regulation, particularly when threatening diseases are involved, may be in the offing. When diseases threaten industries, it is reasonable to expect that government may be awakened from its regulatory slumber.

Finally, we consider, as *Penn Central* directs, the character of government action. The purpose and importance of the government action are relevant under this *Penn Central* factor. *See Rose Acre*, 559 F.3d at 1283. Here, the purpose of the government action was to protect

wildlife in Iowa from a potentially contagious disease by imposing a quarantine on land where the diseased deer had been present. There is no doubt the Brakkes felt the brunt of the government's action. Yet there is nothing in the record to suggest the Brakkes were arbitrarily singled out for special treatment.

Further, the testimony at the hearing indicated the action taken by the government was not substantially out of proportion to the purpose and importance behind the regulatory regime. Any physical invasion of the land was minimal. In light of all the facts and circumstances, the government has not taken "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or outs the owner from his domain." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082.

**VI. Conclusion.**

For the above reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Mansfield and Waterman, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I respectfully dissent with respect to Part III of the court's opinion. I believe the court is taking an overly technical view of the underlying statutory authority provided to the Iowa Department of Natural Resources (DNR).

I do not share the majority's view that the statute is clear and unambiguous. We read statutes as a whole. *See In re Estate of Gantner*, 893 N.W.2d 896, 902 (Iowa 2017). Iowa Code section 484C.12(1) (2013) says the DNR "may provide for the quarantine of diseased preserve whitetail that threaten the health of animal populations." Yet the next subsection, 484C.12(2), states "[t]he landowner, or the landowner's veterinarian, and an epidemiologist designated by [DNR] shall develop a plan," which "shall be designed to reduce and then eliminate the reportable disease, and to prevent the spread of the disease to other animals." Iowa Code § 484C.12(2). Both subsections need to be read together.

If we read subsection 1 as limiting DNR's authority strictly to the diseased deer themselves, we cannot account for subsection 2, which gives the DNR broader authority over a "landowner" to implement a plan to "eliminate the reportable disease" and prevent its spread "to other animals." When we interpret a statute, we try to harmonize its parts. *Iowa Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 876 N.W.2d 800, 805 (Iowa 2016). Doing so here, I would conclude that the term "quarantine" gives DNR authority to do what medical science would regard as a reasonable quarantine in response to the outbreak of disease, which may include measures that affect the land as well as the animals.

The majority's hypertechnical interpretation of the statute proves too much. Note that the statute says "quarantine of diseased preserve whitetail," not "quarantine of whitetail that may have been exposed to the disease." Thus, under the majority's view, DNR could only take action with respect to deer that currently *have* the disease, not to other deer on the farm that have been *exposed to* the disease. That is not all. Under the majority's view, DNR could not require the landowner to disinfect areas of the farm where the diseased deer have been recently. Furthermore, once the diseased deer have died and their carcasses have been removed, DNR would be without authority altogether. If the majority is right, DNR's authority would be limited strictly to the sick animals themselves and nothing else.[5]

Although I do not think we need to reach the absurd-results doctrine in light of the ambiguity of section 484C.12 taken as a whole, the majority's reading of the statute is indeed absurd. If a hospital has authority to "quarantine" a patient, does that mean it can't keep people out of the patient's room when the patient is not there? Any infectious disease quarantine has to have some connection to a place where an infected individual has been, not just to that individual.[6]

Furthermore, DNR has issued a regulation that clearly empowers DNR to do what it did. It provides, "A positive test result for chronic wasting disease will result in a minimum of a five-year quarantine on the preserve and all remaining animals located within the infected preserve."

---

[5]Under the majority's view that Iowa Code section 484C.12 only authorizes DNR to isolate the diseased animals and do nothing else, I question whether DNR could even direct the landowner to *kill* the animals.

[6]I agree with DNR: "A spatial component is therefore implicit in the definition of quarantine."

Iowa Admin. Code r. 571—115.10. While Iowa Code section 484C.3 is a general grant of rulemaking authority,[7] rather than a specific grant of interpretive authority, it is fair to characterize "quarantine" as "specialized language" and "a substantive term within the special expertise of the agency." *See Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 13–14 (Iowa 2010). Hence, I would defer to DNR's interpretation unless it is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*). Both sides in this appeal agree that this deferential standard of review is appropriate here.

I do not think it is "irrational, illogical, or wholly unjustifiable" to interpret section 484C.12 as giving DNR authority to require reasonable actions to prevent the spread of the disease based upon where the animals previously were in addition to simply moving the diseased animals themselves.

Additionally, this law operates in a public health area where the State historically has broad authority to act. "Unquestionably, the inherent police power of a state allows a state to establish quarantines to control disease in animals." *Johansson v. Bd. of Animal Health*, 601 F. Supp. 1018, 1021 (D. Minn. 1985).

In *Shinrone Farms, Inc. v. Gosch*, we were asked to interpret an Iowa Code section relating to brucellosis control. *See* 319 N.W.2d 298 (Iowa 1982). At the time the relevant Code section provided,

> Whenever the balance of [the county brucellosis eradication] fund becomes less than twenty-five hundred dollars, the county auditor shall notify the department [of agriculture] in writing of such fact, and no expense shall be incurred on such account in excess of the cash available in such fund.

---

[7]Iowa Code section 484C.3 provides, "The department shall adopt rules pursuant to chapter 17A as necessary to administer this chapter."

Iowa Code § 164.27 (1975). In 1977, the Sac County brucellosis eradication fund lacked sufficient funds to indemnify Shinrone in full for a brucellosis control claim. *Id.* at 300. Following the farm's commencement of litigation, the farm and the county entered into a settlement whereby levies for the benefit of the fund in the maximum amount would continue in future years and the fund would make payments to Shinrone in future years, until Shinrone's indemnity claim was paid off. *Id.* The attorney general, however, issued an opinion that "the county could not commit the fund, for successive years, to payment of the claim." *Id.*

We found the settlement was binding and enforceable notwithstanding Iowa Code section 164.27 and other Code provisions. We first observed, "Because chapter 164 is a health regulation within the state's police power, it is to be liberally construed." *Id.* at 302. We then held that section 164.27, "if interpreted to foster the public health objectives of chapter 164, permits the settlement entered into in this case." *Id.* at 304. In our view, the section only prohibited current cash payments once the fund balance fell below $2500, not binding agreements to make payments in future years. *Id.* at 304–05.

Courts must be sensitive to regulatory overreach. Government agencies should not issue a quarantine order that affects a landowner's livelihood without a legitimate medical and scientific basis for doing so. Although the parties strongly disagree as to the need for the measures ordered here, the conflicting scientific evidence was presented to the commission, which upheld DNR's order. The district court's order, like today's opinion, is based solely on DNR's alleged lack of legal authority due to a crabbed reading of a statute. I'm not qualified to evaluate the science, but on the law I disagree with my colleagues.

For the foregoing reasons, I would reverse the district court's judicial review order and reinstate the decision of the Natural Resource Commission.

Waterman, J., joins this concurrence in part and dissent in part.