# IN THE COURT OF APPEALS OF IOWA

No. 19-0674
Filed November 4, 2020

**STATELINE COOPERATIVE,**
        Plaintiff-Appellant/Cross-Appellee,

**vs.**

**IOWA PROPERTY ASSESSMENT APPEAL BOARD,**
        Defendant-Appellee/Cross-Appellant,

**and**

**EMMET COUNTY BOARD OF REVIEW,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Emmet County, Don E. Courtney,

Judge.

        Parties appeal and cross-appeal following judicial review.  **AFFIRMED IN**

**PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON**

**CROSS-APPEAL.**

        Brant D. Kahler, Adam C. Van Dike, and Steven C. Schoenebaum of Brown,

Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for

appellant.

        Brett Ryan of Watson & Ryan, PLC, Council Bluffs, for appellee Emmet

County Board of Review.

        Bradley O. Hopkins and Jessica Braunschweig-Norris, Des Moines, for

appellee Iowa Property Assessment Appeal Board.

        Heard by Mullins, P.J., and May and Schumacher, JJ.

**MULLINS, Presiding Judge.**

StateLine Cooperative (StateLine) appeals the district court's judicial-review ruling affirming the Iowa Property Assessment Appeal Board's (IPAAB) administrative decisions following its review of the Emmet County Board of Review's (ECBR) property-assessment determination. StateLine argues (1) the district court lacked jurisdiction to consider the ECBR's cross-appeal of IPAAB's decision on judicial review, (2) the court erred in affirming IPAAB's decision that certain structures were not exempt from taxation as "[m]achinery used in manufacturing establishments" pursuant to Iowa Code sections 427A.1(1)(e) and 427B.17(3) (2014), and (3) the court erred in concluding StateLine did not meet its evidentiary burden to value the exemption associated with the structures. The ECBR cross-appeals, essentially arguing its original assessment was made in accordance with the Iowa Real Property Appraisal Manual (manual) and was therefore correct.

## I.    Background Facts and Proceedings

In 2013, StateLine constructed a feed manufacturing facility in Emmet County. In early 2014, the property was assessed at $4,272,900.00 for property-tax purposes. The county assessor's office hired a certified appraiser and assessor, Ted Goslinga, to appraise the property and approved his assigned assessment. Upon direction from the Iowa Department of Revenue and the manual, Goslinga assessed the property using a cost-to-value approach, which values the property at cost, less depreciation. He testified that, if a particular item is included in the manual, then it is taxable, but if an item is not included in the manual, it is exempt.

Following the assessment, StateLine petitioned the ECBR for review of the assessment, claiming some of its "manufacturing machinery" was exempt and therefore improperly included in the assessed value. StateLine requested the assessed value be reduced to $870,700.00. Relevant to this appeal are components of building one, the feed mill, and buildings five and six, grain storage bins. StateLine requested the value of building one be reduced by $1,633,900.00 to exempt ingredient and load-out bins and the values of buildings five and six— including their aeration floors, fans, dryers, and power sweeps—be respectively reduced by $755,400.00 and $89,300.00, all as machinery used in a manufacturing establishment. Ultimately, the ECBR affirmed the property assessment. StateLine appealed to the IPAAB.

According to testimony at the ensuing IPAAB hearing, ingredients other than corn are conveyed to the ingredient bins in building one where they are stored and eventually "flow out the bottom in a continuous flow process into the manufacturing process and other machinery." At the top of the ingredient bins is a rotating, mechanical ingredient distributor that directs ingredients into the proper bin. An automated feed batching system then directs how much of each ingredient is to be released from the separate ingredient bins. The feed drops onto a scale and then into a four-ton mixer. Then it drops into a surge, which distributes it to a conveyor. If the product is meal feed, it is directed to the load-out bins, where it is held and then distributed out the bottom into semi-trucks for delivery. If the product is to be pellet feed, it is conveyed to a pelleter, where it is further processed, and then conveyed back to the load-out bins in building one. The load-out bins are

equipped with an air gate at the bottom, which is opened to release the feed into the trucks.

StateLine's chief financial officer (CFO) testified the $1,633,900.00 claimed exemption as to building one included all the foregoing component parts of building one. He also testified: "They're all integral parts of the manufacturing process. It's basically a continuous flow from beginning to end, and all these things are interconnected to all other pieces of machinery in the manufacturing process." The feed department manager testified the materials entering and exiting the facility are "essentially continuously flowing." There is an open area under the ingredient and load-out bins. The CFO valued the area at approximately $52,000.00 by multiplying its square footage of 2228 square feet by the value for square foot assigned by the assessor for similar building structures, $23.60.

If the ingredient is corn, it is conveyed to buildings five and six upon delivery to the facility. When the corn reaches the buildings, it is either gravity-fed into building six or conveyed further and dumped into building five. Building five is the newer and larger steel grain storage bin. The bin is equipped with an aeration floor with holes in it and two fans. The fans pull air down through the aeration floor to ensure air movement and maintain the quality of the ingredients. It is also equipped with a power sweep that pivots around the diameter of the bin. Building six is the smaller and older grain bin and contains the same components.[1] After reaching the bins, the corn gravity-flows through the holes in the bottom of the bins

---

[1] However, the power sweep was removed after the initial assessment for safety reasons.

and drops to reclaim conveyors that transport the corn to be rolled and then added to the other ingredients.

A hearing was held before the IPAAB in October 2015. Following the hearing, the IPAAB took judicial notice of the manual. On February 26, 2016, the IPAAB, issued its ruling. The IPAAB accepted the parties' stipulation that the subject property was a manufacturing facility. As to building one, the IPAAB found "insufficient evidence to show the entirety of the feed mill . . . bins are machinery used in a manufacturing establishment." The IPAAB also found that some items within building one "could be machinery [but] StateLine has not shown the correct value of the exempt portions or the correct value of the remaining taxable portions of the property." As to building five, the IPAAB found the aeration floor, fans and dryers, and power sweeps were exempt and respectively valued them at $39,100.00, $26,100.00, and $14,100.00. As to building six, the IPAAB found the same items were exempt and respectively valued them at $5300.00, $2800.00, and $3200.00.[2] The IPAAB found the evidence insufficient to show the steel storage bins housing the foregoing items were machinery. As such, the IPAAB "affirm[ed] the assessment of the feed mill and grain storage bins."

On March 17, StateLine filed a petition for judicial review, challenging the IPAAB's refusal to deem all or part of the feed mill and the steel grain bins exempt. On March 23, the ECBR filed a notice of cross-appeal. Thereafter, on April 7, StateLine moved to dismiss and strike the cross-appeal, arguing the ECBR was

---

[2] The IPAAB accepted StateLine's purported valuations for each of the items it found exempt. These were the same values that were assigned by the assessor. The IPAAB found other items to be exempt, but they are generally irrelevant to this appeal.

required to file its own petition for judicial review to challenge the IPAAB's ruling and the notice of cross-appeal was not filed within the time constraints of filing a petition for judicial review of agency action. The ECBR resisted, arguing, as a party in the contested agency proceeding, it timely appeared in the judicial-review proceeding. Later, StateLine moved for a remand to the IPAAB for the purpose of presenting additional evidence.

Following a hearing, the district court denied the motion to dismiss and strike the cross-appeal. However, the court granted the motion for a limited remand and ordered the IPAAB "to receive additional evidence on, and determine, the portions and corresponding values of the feed mill building and two exterior grain bins."

The matter proceeded to a remand hearing before the IPAAB in August 2017. At the hearing, StateLine only requested the IPAAB to change its position on whether the overhead bin portion of building one and the walls and roofs of buildings five and six were exempt.[3]

StateLine presented testimony from its expert, commercial real estate appraiser Don Vaske, who appraised the feed mill in March 2017. In his testimony,

---

[3] In briefing and oral argument, StateLine asserted it did not concede the concrete floors or foundation of buildings five and six were not exempt. But at the remand hearing, StateLine noted the initial agency

> ruling in this matter made it clear that the concrete floor and foundation of [buildings five and six] were properly taxed. And StateLine is not arguing otherwise today. We are, however, arguing that the wall and roof of both of those grain bins are exempt as machinery used in manufacturing.

Then, in its post-hearing brief, StateLine only argued the "walls and roofs"—not the concrete floors or foundations—should be exempt. The IPAAB had no reason to revisit the issue, and neither do we.

he noted the 2014 assessment separated building one into two components: (1) above grade and (2) the basement and tunnel. The assessment of building one did not include other structures built around the footprint of the overhead bins. The above-grade portion, including the ingredient and load-out bins, consisted of 156,244 cubic feet. The basement and tunnel consisted of 3337 cubic feet. As to the above-grade portion, the assessor applied a cost per cubic foot of $6.40 and a replacement multiplier of 1.50 to reach an adjusted new replacement cost of approximately $1,499,943.00. The assessor then applied 2% depreciation to reach an assessment value of $1,469,950.00.[4] As to the basement and tunnel, which StateLine agreed was not exemptible, the assessed value was $215,590.00.

For his appraisal, Vaske separated the above-grade portion into two components: (1) the overhead bins and (2) the open space below them. With the footprint being 2228 square feet and the height of the open space below the bins being eighteen feet, he calculated the open space to be 40,104 cubic feet. At a cost per cubic foot of $9.41, Vaske assessed the open space value at $377,400.00.[5] Vaske then subtracted that value from the assessor's total above-grade assessed value of $1,469,950.00 to reach an appraised value for the

---

[4] The product of these figures is $1,469,944.14. We presume the assessor prefers to work in convenient numbers. We also note numbers were rounded to nearest whole dollars along the way.

[5] This is also a rounded number. It appears Vaske ran his calculation differently than the assessor. The assessor began with the cost per cubic foot of $6.40 and applied the 1.50 multiplier to reach an adjusted new replacement cost. Then the assessor factored in the 2% depreciation to reach an assessed value. Vaske simply divided the assessor's assessed value of $1,469,950.00 by the 156,244 cubic feet of above-grade space to reach a cubic foot price of $9.41. This would essentially be the equivalent of factoring in the depreciation before reaching an adjusted new replacement cost.

overhead bins of $1,092,550.00. Similarly, the record shows the construction cost of the "modular bin system," which was completed shortly before the 2014 assessment, was $1,032,500.00.

As to building five, Vaske noted the assessor assigned a base cost to the actual structure—limited to the concrete floor, walls, and roof—of $697,000.00 and applied 3% depreciation to reach an assessed value of $676,100.00.

As to building six, Vaske explained the assessor assigned a base cost to the structure—again, limited to the concrete floor, walls, and roof—of $193,000.00, applied a multiplier of 1.01 to reach an adjusted cost of $194,930.00, and factored in 60% depreciation to reach an assessed value of $78,000.00.

For his appraisal, Vaske separated the assessed values of buildings five and six into two components: (1) the walls and roof and (2) the foundation. He interviewed three companies relative to the costs associated with constructing bins of similar size and capacity, including the foundation, structure, and associated equipment, such as "doors, ladders, vents, cables, sweep augers, fans, etc." One professional opined the concrete floor would account for 20–25% of the total cost for the larger bin and 25–30% for the smaller bin. The second reported the concrete component accounted for 29% of the cost on a recently completed bin he constructed. The third professional's estimated figures were generally in line with the first two. Based on his investigation he concluded the concrete portion of each grain bin would account for 25% of the entire structure. So Vaske took 25% of the assessed value of buildings five and six, including their components, $755,400.00 and $89,300.00, respectively, to reach values of the concrete floors in the amount of $188,850.00 and $22,325.00, respectively. He then subtracted those figures

from the assessed values allocable to the structures—including the concrete floors, walls, and roofs—to reach values allocable to the walls and roof of each building of $487,250.00 and $55,675.00.

In March 2018, the IPAAB issued its remand decision. The IPAAB concluded:

> StateLine has not shown the overhead bins (ingredient and loadout) or the large/small exterior grain bin[s'] walls and roof are machinery. We do not believe any of them would commonly be understood to be machinery. Their primary purpose is to hold raw material, protecting it from elements, until it is needed in the manufacturing process.

The IPAAB added that, had StateLine proved the items were machinery, then it was also required to show the amount of the assessment attributable to those items, and it was "not convinced that Vaske's allocations accurately reflect the value of the property StateLine believes to be exempt." As to the exterior grain bins, while finding Vaske's methodology sound, the IPAAB noted he failed to account for site work or how it would be allocated. As to the overhead bins, the IPAAB found Vaske's straight-line, cubic-foot estimate "does not necessarily result in an accurate valuation" of the components of the structure. The IPAAB affirmed its prior ruling.

In April, StateLine filed an amended petition for judicial review. Following briefing from the parties, the district court entered its judicial-review decision, affirming the IPAAB's decision. StateLine appeals, and the ECBR cross-appeals.

## II. Scope and Standard of Review

"Judicial review of agency decisions is governed by Iowa Code section 17A.19" (2016).[6]  *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 530 (Iowa 2017) (quoting *Kay-Decker v. Iowa State Bd. of Tax Rev.*, 857 N.W.2d 216, 222 (Iowa 2014)); *accord Warren Props. v. Stewart*, 864 N.W.2d 307, 311 (Iowa 2015). The district court acts in an appellate capacity in judicial-review proceedings.  *Iowa Med. Soc'y v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 838 (Iowa 2013).  On appeal, this court "appl[ies] the standards of section 17A.19(10) to determine if we reach the same results as the district court."  *Brakke*, 897 N.W.2d at 530 (quoting *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010)); *accord Des Moines Area Transit Auth. v. Young*, 867 N.W.2d 839, 842 (Iowa 2015).  Relief in a judicial-review proceeding is appropriate only "if the agency action prejudiced the substantial rights of the petitioner and if the agency action falls within one of the criteria listed in section 17A.19(10)(a) though (n)."  *Brakke*, 897 N.W.2d at 530.

## III. Jurisdiction

StateLine argues the district court lacked subject matter jurisdiction to consider the ECBR's cross-appeal and therefore erred in denying its motion to dismiss.  Our review of subject matter jurisdiction is for correction of errors at law. *Iowa Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 876 N.W.2d 800, 804 (Iowa 2016).

---

[6] References in this opinion to Iowa Code chapter 17A are to the version of the code in force when the petition for judicial review was filed, 2016.  Unless otherwise noted, references to other chapters of the code are to the code in force when the administrative proceeding was initiated, 2014.

The IPAAB filed its first ruling on February 26, 2016. The letter of disposition was postmarked for mailing on February 29. The order provided: "Any judicial action challenging this Order shall be filed in the district court where the property is located within 20 days of the date of this Order and comply with the requirements of Iowa Code sections 441.38, 441.38B, 441.39; and Chapter 17A." Section 441.38 requires notices of appeal from the IPAAB to be filed in the district court "within twenty days after the letter of disposition of the appeal by the [IPAAB] is postmarked to the appellant." Section 441.38B provided parties could seek judicial review in accordance with chapter 17A and section 441.38.[7] Chapter 17A provides a petition for judicial review "must be filed within thirty days after the issuance of the agency's final decision in that contested case." Iowa Code § 17A.19(3). Section 17A.19 also provides it is "the exclusive means by which a person or party . . . may seek judicial review of . . . agency action" "[e]xcept as expressly provided otherwise by another statute referring to [chapter 17A] by name."

StateLine filed its petition for judicial review on March 17. ECBR filed its notice of cross-appeal on March 23. The parties appear to agree that the deadline to commence a proceeding in the district court was March 20. StateLine is of the position that the filing of the cross-appeal beyond that date deprived the district court of jurisdiction and, because chapter 17A provides no mechanism for filing a cross-appeal in an action for judicial review, the ECBR was required to file its own timely petition for judicial review. StateLine relies on *City of Hiawatha v. City Development Board*, 609 N.W.2d 532, 537 (Iowa 2000), to support its position. In

---

[7] Section 441.38B was repealed in 2017. 2017 Iowa Acts ch. 151, § 26.

that case, the city of Robins approved applications for voluntary annexation and requested approval from the city development board. *Hiawatha*, 609 N.W.2d at 534. Shortly thereafter, the city of Hiawatha filed a petition for involuntary annexation that included land common to the voluntary annexation sought by Robins. *Id.* Then, Hiawatha filed a voluntary annexation application as to two parcels that were included in the application submitted by Robins. *Id.* The board amended the Robins application to exclude those two parcels, approved Hiawatha's annexation of those parcels, and approved annexation of the remainder of the contested area to Robins. *Id.* The board issued its findings of fact and conclusions of law on August 11, 1997, and Hiawatha filed a petition for judicial review on September 9. *Id.* at 534–35. Robins did not petition for judicial review but instead intervened in the proceeding initiated by Hiawatha. *Id.* at 535. The district court ultimately affirmed, after which Hiawatha appealed and Robins cross-appealed. On cross-appeal, Robins complained of the board removing the two parcels from its application and assigning them to Hiawatha. *Id.* at 537. The supreme court stated, "The problem with this argument is that Robins did not petition for judicial review" and "we see nothing in chapters 17A or 368 that would permit an aggrieved party to challenge the ruling in that manner." *Id.* Viewing that language in isolation would arguably support StateLine's jurisdictional challenge. But we do not read the language in isolation. In *Hiawatha*, the "board's decision allowing Hiawatha to annex the two parcels in question was . . . issued on April 9, 1997" and "Hiawatha's annexation of the two parcels became complete upon the expiration of the time for review of the board's decision" and proper filings. *Id.* At the time, a city could appeal a decision of the development board within thirty days

by petitioning for judicial review. *See* Iowa Code § 368.22 (1997). What the supreme court was saying was Robins was required to petition for judicial review before the annexation became final following issuance of the April 9, 1997 decision of the board, which it did not. *See Hiawatha*, 609 N.W.2d at 537. By the time Hiawatha petitioned for judicial review, the issue Robins raised on cross-appeal was already final for statutory and judicial purposes, so the district court had no jurisdiction to consider it. *See id.* What the supreme court did not say, StateLine's argument on this point, is that each party to a judicial-review proceeding is required to file its own petition.

We agree with StateLine that "a timely petition to the district court is a jurisdictional prerequisite for judicial review of final agency action." *See id.* Judicial-review proceedings are commenced by filing a timely application for judicial review in the proper venue. *See* Iowa Code § 17A.19(2). StateLine did so, and conferred jurisdiction on the district court to conduct judicial review. Following conferral of jurisdiction, "[a]ny party of record in a contested case before an agency wishing to intervene and participate in the review proceeding" may do so by filing "an appearance within forty-five days from the time the petition is filed." *Id.* StateLine does not dispute that ECBR timely intervened. Instead, StateLine argues, "As an intervenor, the ECBR cannot expand the scope of the judicial review action" through its intervention. StateLine again relies on *Hiawatha*, which we find misplaced. Unless inconsistent with chapter 17A, "the rules of civil procedure shall be applicable to proceedings for judicial review of agency action." Iowa R. Civ. P. 1.1601. Because "[a]n intervenor may join with petitioner or respondent or claim adversely to both," Iowa R. Civ. P. 1.1603(1), an intervenor

can certainly expand the scope of judicial review beyond the petitioner's requests for relief. Following the analysis of *Doerfer Division of CCA v. Nicol*, 359 N.W.2d 428, 436–37 (Iowa 1984), we have specifically held "that a district court has jurisdiction to review claims for affirmative relief by a cross-claimant even though the cross-claimant did not file a petition for judicial review." *Consumer Advoc. Div. v. Utils. Bd.*, 423 N.W.2d 552, 552–53 (Iowa Ct. App. 1988).

Based upon the foregoing, we reject StateLine's jurisdictional and related challenges.

## IV.     Machinery Used in a Manufacturing Establishment

### A.     Appeal

StateLine argues the district court erred in affirming the IPAAB's decision. The overarching argument appears to be that the IPAAB and district court misinterpreted section 427A.1(1)(e) to not include buildings one, five, and six.

We review issues of statutory interpretation for correction of errors at law. *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018). In interpreting a statute, "[w]e start with the often-repeated goal of statutory interpretation which is to discover the true intention of the legislature." *Gardin v. Long Beach Mortg. Co.*, 661 N.W.2d 193, 197 (Iowa 2003). The "first step in ascertaining the true intention of the legislature is to look to the statute's language." *Id.* "If the statute is unambiguous, we look no further than the statute's express language." *Kay-Decker*, 857 N.W.2d at 223 (quoting *Rolfe State Bank v. Gunderson*, 794 N.W.2d 561, 564 (Iowa 2011)). "If, however, the statute is ambiguous, we inquire further to determine the legislature's intent in promulgating the statute." *Id.* "A statute is

ambiguous when reasonable minds could disagree as to its meaning." *Naumann v. Iowa Prop. Assessment Appeal Bd.*, 791 N.W.2d 258, 261 (Iowa 2010).

### 1.      The exemption and its breadth

The assessor "shall [c]ause to be assessed" all property in the county "except property exempt from taxation." Iowa Code § 441.17(2). Property defined in Iowa Code section 427A.1(1)(e), which is first assessed for taxation on or after January 1, 1995, shall be exempt from taxation. *Id.* § 427B.17(3). Section 427A.1(1)(e) encompasses: "Machinery used in manufacturing establishments. The scope of property taxable under this paragraph is intended to be the same as, and neither broader nor narrower than, the scope of property taxable under section 428.22, Code 1973, prior to July 1, 1974." Iowa Code section 428.22 (1973) contemplated "Machinery deemed real estate," and provided, "Machinery used in manufacturing establishments shall, for the purpose of taxation, be regarded as real estate." While section 428.20 of the 1973 and current codes define who a "manufacturer" is—and the parties agree StateLine operates a "manufacturing establishment"—neither defines what "machinery" is.

We begin with the breadth of what is covered by the statute. StateLine is of the position that "[t]he exemption should be interpreted broadly." Our supreme court has said as much when it considered whether a manufacturing company's "cupola, vertical annealing furnace, and smokestack" were manufacturing machinery and therefore exempt from taxation. *Griffin Pipe Prods. Co., Inc. v. Bd.*

*of Rev. of Cnty. of Pottwattamie*, 789 N.W.2d 769, 770, 775 (Iowa 2010).[8] The

court described the manufacturer and its fixtures as follows:

> Griffin Pipe Products Co., Inc. is a manufacturer of ductile iron pipe products with a foundry located in Council Bluffs, Iowa. The foundry's physical plant includes a cupola, a vertical annealing furnace, and a steel exhaust stack. The cupola occupies three floors and extends above the roofline of the main production building and is used to melt the metals during the casting process. The vertical annealing furnace, which sits in the basement of the main production building and rises above the main floor of the plant, is used to alter the hardness and add strength to metal. The exhaust stack is connected to the exterior of the primary production building and vents hot gases and fine particulate matter generated by the smelting process.

*Id.* at 770. The assessor included the value of the fixtures in its assessment. *Id.*

The "narrow question" of whether "'[m]achinery used in manufacturing

establishments' under Iowa Code section 427A.1(e) includes within its scope

common law fixtures" made its way to the supreme court. *Id.* at 773 (alteration in

original). Iowa authority on the issue was limited. The court acknowledged it had

previously concluded a plant's "water systems, air separators, dust collectors, and

truck turn around fell within the scope of a precursor to paragraph (e), then Iowa

Code section 428.22 (1950)." *Id.* (discussing *Nw. States Portland Cement Co. v.*

*Bd. of Rev.*, 58 N.W.2d 15, 19–21 (Iowa 1953)). The court also noted the

regulatory language of Iowa Administrative Code rule 701-71.7—"that machinery

under Iowa Code section 427A.1(1)(e) 'shall include *all* machinery used in

---

[8] In oral argument, the ECBR took the position *Griffin Pipe* is inapposite on the issue of the breadth the term machinery is entitled because that case only considered whether fixtures could fall within the meaning of machinery. Because the items claimed exempt in this appeal generally amount to fixtures, we find *Griffin Pipe* applicable. In any event, as discussed below, the supreme court extended its holding beyond fixtures to include movable items. *Griffin Pipe*, 789 N.W.2d at 775.

manufacturing establishments'"—"suggests that subsection (e) must be given a broad interpretation to include common law fixtures." *Id.* at 774. The court also noted the "lack of qualifying language" and "express words of limitation indicates that the legislature did not intend to limit the scope of section 427A.1(1)(e)." *Id.* The court concluded the statutory and regulatory scheme implied "that all machinery, attached or unattached, fixtures or movable items, falls within the scope of paragraph (e)." *Id.* at 775.

### 2. Interpretation

Having concluded machinery under section 427A.1(1)(e) is entitled to a broad interpretation, we consider whether buildings one, five, and six fall within the meaning of the statute. As noted, machinery is not statutorily defined. A department of revenue regulation that classifies real estate provides, "Machinery includes equipment and devices, both automated and nonautomated, which is used in manufacturing as defined in Iowa Code section 428.20." Iowa Admin. Code. r. 701-71.1(7)(b). Where "the legislature has not defined words of a statute, we may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage." *Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 516 (Iowa 2012) (citation omitted).

Machinery has been defined to include "machines in general or as a functioning unit," as well as "the means or system by which something is kept in action or a desired result is obtained." Merriam Webster, *Machinery*, https://www.merriam-webster.com/dictionary/machinery. In the tax context, "[t]o be exempt, the machinery must be used primarily in manufacturing, and be

essential to the manufacturing process." 71 Am. Jur. 2d *State & Local Taxation*

§ 267 (Aug. 2020 update).

> The machinery and equipment of an industrial establishment to be excluded from taxation are those which are used directly in manufacturing the products that the establishment is intended to produce and are necessary and integral parts of the manufacturing process and are used solely for effectuating that purpose; on the other hand, excluded from this category are machinery and equipment which benefit the land generally and which may serve various users of the land and structures which are not necessary and integral parts of the manufacturing process and which are separate and apart therefrom. A utility's smokestacks, cooling towers, and water intake facility are integral to its generation of electricity and used solely for that purpose and, thus, exempt. Communications towers, on the other hand, which transfer and receive signals and are not involved in producing a product, are not exempt.

84 C.J.S. *Taxation* § 332 (June 2020 update) (footnotes omitted).

In one case, the Wisconsin Court of Appeals considered whether silos at a

concrete-manufacturing facility were exempt under a statute exempting the

following property:

> Manufacturing machinery and specific processing equipment, exclusively and directly used by a manufacturer in manufacturing tangible personal property. In this section, "manufacturing machinery and specific processing equipment" means any combination of electrical, mechanical or chemical means, including special foundations therefor, designed to work together in the transformation of materials or substances into new articles or components, including parts therefor, regardless of ownership and regardless of attachment to real property. This shall not be construed to include materials, supplies, buildings or building components; nor shall it include equipment, tools or implements used to service or maintain manufacturing machinery or equipment.

*Geis v. City of Fond Du Lac*, 409 N.W.2d 148, 150 (Wis. Ct. App. 1987) (quoting

Wis. Stat. § 70.11(27)). The court described the silos as follows:

> The silos [are] used to store the sand and stone [and] have probes and weeping holes. These silos assure a consistent mix in the gravel, prevent the "fines" (very fine sand) from blowing away and

allow the moisture content of the sand to be monitored and regulated through the use of probes and weeping holes. The silos also prevent the sand from being contaminated with mud or other impurities.

*Id.* at 149. Because the silos were "necessary to preserve the integrity of the sand and gravel," the court concluded "[t]he storage purpose is vital to the manufacturing process, making the silos an integral part of the manufacturing process and therefore tax-exempt." *Id.* at 151.

In another case, the Supreme Court of Minnesota considered whether oil storage tanks were exempt as "equipment" under the following statutory scheme:

For the purposes of taxation, "real property" includes the land itself, rails, ties, and other track materials annexed to the land, and all buildings, structures, and improvements or other fixtures on it, bridges of bridge companies, and all rights and privileges belonging or appertaining to the land, and all mines, minerals, quarries, fossils, and trees on or under it.
. . . .
The term real property shall not include tools, implements, machinery, and equipment attached to or installed in real property for use in the business or production activity conducted thereon, regardless of size, weight or method of attachment.

*Barton Enters., Inc. v. Ramsey Cnty.*, 390 N.W.2d 776, 777 (Minn. 1986) (quoting Minn. Stat. § 272.03(1)(a), (c)(i) (1984)). The manufacturer and storage tanks were described as follows:

Barton sells asphalt cement (residual oils) and fuel oils, primarily to construction companies. The oils are stored in 11 tanks . . . . The tanks are interconnected by pipes, and pumps are used to transfer oils from receiving to loading stations, to blend oils to the desired grades, and to maintain the specified grades of the asphalts, which change character frequently because they are held at a temperature of 300°F.

*Id.* The court agreed with the tax court that the basic function of the tanks was to provide containment or shelter and was therefore not exempt. *See id.* at 777–78.

A string of cases has emerged from Pennsylvania. In one case, the supreme court found oil storage tanks in which physical and chemical processes necessary to the process of the manufactured product take place are excluded from tax assessment as machinery used in manufacturing. *Gulf Oil Corp. v. Philadelphia*, 53 A.2d 250, 250, 254 (Pa. 1947). In a later case, the supreme court considered whether the following exemption from taxability of real property and fixtures applied to property of a steel manufacturer: "Machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment." *Appeal of Borough of Aliquippa*, 175 A.2d 856, 859 (Pa. 1961) (citation omitted). The court explained the exemption applies to any improvements used "*directly* in manufacturing" that "are necessary and integral parts of the manufacturing process and are used *solely* for effectuating that purpose." *Id.* at 861. The court also directed that structures that "are not necessary and integral parts of the manufacturing process," such as "[a] structure used for storage," "is part of the realty and subject to real estate taxation." *Id.* at 861–62.

The Pennsylvania court had the opportunity to apply and build upon *Aliquippa* in a subsequent case concerning the property of a steel manufacturer. *See U.S. Steel Corp. v. Bd. of Assessment and Revision of Taxes of Buck Cnty.*, 223 A.2d 92, 95–97 (Pa. 1966). The court found a railroad track serving as a conveyor belt transferring materials from one processing station to another clearly fell within the exemption. *Id.* at 95. The court described the ore-yard facilities to be

used not only as a transshipment and temporary storage area (providing a 'surge' or reserve capacity for a three to ten days' supply or ore for the blast furnaces) for iron ore as discharged from the water or rail carriers, but also constitute receptacles used fundamentally and primarily for the programmed spreading, layering and blending of the nonuniform shipments of grades and sizes of ore received in various cargoes, so as to achieve uniformity for processing in respect to chemical analysis and physical characteristics. On the floor of the ore yard is located movable crushing machinery used in the processing of the ore and the ore yard facilities are peculiarly designed for and used directly in the manufacturing process for the production of iron.

*Id.* at 95–96 (altered for readability). The court concluded, the facilities "are a necessary and integral part of the equipment used in such processes and, except for the incidental and temporary storage feature, are availed of solely for such purposes." *Id.* at 96.

The court also considered whether "blast furnace stock bins" were taxable. Those bins were described as follows:

The blast furnace stock bins are steel structures which contain surge receptacles designed for the in-process purpose of assembling and temporarily holding the various materials used directly to supply the blast furnaces themselves. Iron ore, limestone and other ingredients are carried or deposited into the blast furnace stock bins through grids or openings in a railway trestle which is supported by the stock bins structure. Each such material is then drawn by gravity from the bins in a pre-determined amount into special-purpose cars, weighed and ultimately transported to, and charged or deposited within, one of the three blast furnaces.

*Id.* The court found: "While these bins have an incidental, temporary or 'in-transit' storage aspect, their primary purpose is to serve directly as a material-handling facility for the gathering, combining and mixing of raw materials in the process flow to the blast furnaces." *Id.* The court concluded the bins were not merely storage facilities and found them exempt from taxation. *Id.* The court went on to analyze several other components of the manufacturing facility. *Id.* at 96–97.

The next case considered whether three ammonia tanks fell within the tax-assessment exemption.  *See U.S. Steel Corp. v. Bd. of Revision of Taxes & Appeals of City of Clarion*, 366 A.2d 637, 637–38 (Pa. Commw. Ct. 1967).  After analyzing the two foregoing cases from the state high court, the Pennsylvania Commonwealth Court found the ammonia tanks' storage capabilities were "neither incidental nor temporary," were "used primarily for the storage of ammonia," and their "purification and quality control processes are incidental to the primary functions of the structures as storage tanks."  *Id.* at 639.  Because the "tanks are not used 'directly' in the manufacture of ammonia, nor are they 'necessary and integral parts of the manufacturing process,'" the court concluded they were taxable.  *Id.* at 639.

Next, the Pennsylvania Commonwealth Court considered the taxability of oil tanks that served a purpose "in the refining process to heat the oil, remove water from the crude and agitate the oil to effect a standard mix."  *See Gulf Oil Corp. v. Delaware Cnty. Bd. of Assessment Appeals*, 489 A.2d 321, 322, 324 (Pa. Commw. Ct. 1985).  The court found the tanks were essential in refining crude oil and not subject to taxation.  *Id.* at 325.

Lastly, the Commonwealth Court of Pennsylvania also considered the taxability of oil storage tanks described as follows:

> 17.  The construction of the three tanks occurred simultaneously with the installation of oil-fired boilers when the Springdale Plant was converted from coal to oil.
> 18. Each of the tanks is connected by piping to a pumphouse and, in turn, to two oil-fired boilers in the main plant building.
> 19. Heavy oil is pumped from barges on the Allegheny River into the three oil tanks, where the oil is stored until needed to fire the boilers.

20. Each tank is fitted with steam heating elements connected to small boilers, which heating elements are used to heat the heavy oil prior to use so that it is liquid enough to flow through the piping that connects the tanks to the boilers.

. . . .

22. Once heated, oil is pumped from the tanks and fired in the boilers, producing steam which drives the turbines, which drive the generators, which produce electricity.

23. The oil from the tanks is the sole source of fuel for the boilers.

24. Two of the three tanks have not held oil since approximately 1984.

*W. Penn Power Co. v. Bd. of Prop. Assessment Appeals & Rev.*, 588 A.2d 997, 999 (Pa. Commw. Ct. 1991). The tanks were deemed to not fall under the exemption statute. *Id.* The court held "the oil tanks do not qualify as machinery or equipment used in manufacturing" because "a structure that is only used for storage does not meet the requirements of the exclusion." *Id.* at 1000. The court distinguished *Gulf Oil Corp. v. Delaware County Board of Assessment Appeals* on the basis that, "[a]lthough there is incidental heating while the oil is stored in the tank," the tanks are used only for storage of fuel and are not an integral part of the process for generating power." *Id.*

Finally, the Kentucky Court of Appeals has considered "whether machinery used by distilleries in bottling whiskey" was exempt from taxation as manufacturing machinery. *Burke v. Stitzel-Weller Distillery*, 145 S.W.2d 861, 862 (Ky. Ct. App. 1940). Following production, the whiskey was barreled, after which some of the whiskey was bottled. *See id.* at 862–63. The lower court concluded the machinery used in bottling the whiskey was exempt from taxation. *Id.* at 863. Local officials appealed, contending the manufacturing of the whiskey was complete upon barreling, and the bottling machinery was not used in the course of the

manufacturing process. *Id.* The court of appeals disagreed, concluding manufacturing machinery includes "all things necessary to make it ready to be put on the market so as to be sold to the consuming public for the purpose for which it was intended." *Id.* at 864.

With the foregoing in mind, we proceed to the questions in this appeal.

### 3. Buildings one, five, and six

Again, machinery, for purposes of the statute, is not defined. That is likely for good reason. On the spectrum from machinery to non-machinery, one could easily classify an item falling on the polar opposites of either end. There is of course a gray area, where the items in this case fall, in which the "I know it when I see it" approach is unhelpful. We find it unnecessary to define what amounts to machinery, as the assessment of what falls within the statute must logically be made based on the circumstances on a case-by-case basis.

We turn to the circumstances of this case. Corn and other ingredients are conveyed to the ingredient bins in building one and buildings five and six, each of which are essentially temporary storage facilities. The ingredients are then fed into machinery to produce a finished product. The product then makes its way to the load-out bins, where it is held until loaded into trucks for delivery. The structures essentially amount to nonautomated equipment. *See* Iowa Admin. Code. r. 701-71.1(7)(b); *see also Black's Law Dictionary*, *Equipment* (11th ed. 2019) ("The articles or implements used for a specific purpose or activity (esp. a business operation)."). With the exception of the load-out bins, the structures are "used directly in manufacturing the products that the establishment is intended to produce and are necessary and integral parts of the manufacturing process." 84

C.J.S. *Taxation* § 332. Similar to the ore-yard facilities and blast furnace stock bins in *United States Steel*, the ingredient bins' and grain bins' storage feature is only temporary and incidental, and their primary purpose is to serve directly in the manufacturing process. 223 A.2d at 95–96. As such, we find the ingredient bins in building one and buildings five and six fall within the meaning of machinery under section 427A.1(1)(e). The load-out bins, however, are not used directly in the manufacturing process, and they only contain finished product "ready to be put on the market so as to be sold to the consuming public for the purpose for which it was intended." *See Burke*, 145 S.W.2d at 864. As such, we conclude the load-out bins do not fall within the meaning of machinery under section 427A.1(1)(e).

B.      Cross-Appeal

On cross-appeal, the ECBR appears to argue the assessor properly followed the manual in conducting its assessment and the original assessment is therefore correct. We are not convinced. While the assessor is required to use the manual as a tool in valuing property, we do not find it to be legally controlling on the question of whether a particular item of property is taxable or exempt. While the legislative and executive branches are respectively entitled to enact and enforce the law, interpretation and construction of the law belongs to the courts. 16 Am. Jur. 2d *Constitutional Law* § 266 (Aug. 2020 update). As such, the department of revenue manual does not bind us.

**V.      Valuation**

StateLine argues the district court erred in affirming the IPAAB's conclusion that StateLine failed to meet its evidentiary burden as to the valuation of its claimed exemptions. The ECBR generally claims StateLine was required to show the total

value of the assessable property, not the total assessed value less the claimed exemption. We find no such requirement and disagree. Evidence was presented concerning the total value of the structures and of the claimed exemptions. Because we find sufficient evidence in the record to reach values of the claimed exemptions, we conclude the IPAAB and court acted unreasonably, arbitrarily, or capriciously in declining to value the claimed exemptions, which prejudiced the substantial rights of StateLine. *See* Iowa Code § 17A.19(10)(n). We proceed to the merits and modify as follows.

StateLine's expert valued the overhead bins at $1,092,550.00. The ECBR's own expert valued the overhead bins at $778,240.00. The evidence presented shows the assessor assessed the feed mill based on its cubic footage. The record also shows the ingredient bins occupy in the neighborhood of 47,280 cubic feet. Applying the assessor's cost per cubic foot of $6.40, the 1.50 replacement multiplier, and 2% depreciation, the ingredient bins' value amounts to $444,810.24, and we find the assessment should be reduced by that amount to reflect the exemption of the ingredient bins as machinery used in manufacturing.[9]

As to the exterior grain bins, while finding Vaske's methodology sound, the IPAAB noted he failed to account for site work or how it would be allocated. As a result, the IPAAB noted it would value the foundation cost for those buildings at 30%, as opposed to the 25%.

---

[9] Applying the same methodology, we would value the roughly 24,576 cubic feet occupied by the load-out bins at $231,211.01. But the load-out bins are not exempt as machinery.

For building five, Vaske began with the assessor's assigned base cost of $697,000.00 and applied 3% depreciation to reach a value of $676,100.00 as to the foundation, walls, and roof. As to building six, he began with the base cost of $193,000.00 and applied an adjustment multiplier of 1.01 and 60% depreciation to reach a value of $78,000.00 as to the same components.

The replacement cost assigned by the assessor for the buildings was $755,400.00 and $89,300.00. The IPAAB agreed 30% of that cost would be attributable to the foundation and, upon our review of the evidence, we agree. So the foundations would be valued at $226,620.00 and $26,790.00, which is not exempt. $79,300.00 worth of building five's components and $11,300.00 worth of building six's components were already determined to be exempt. That leaves $449,480.00 and $51,210.00 attributable to the walls and roof, which we conclude is exempt from taxation as machinery.

## VI.  Conclusion

We conclude the ingredient bins and exterior grain bins, but not the load-out bins, amount to machinery used in a manufacturing facility and are exempt from taxation. We reverse the district court's affirmance of the IPAAB on that point. Because we find sufficient evidence in the record to reach values of the claimed exemptions, we conclude the IPAAB and court erred when they declined to do so. We value the additional exemptions for building one at $444,810.24, building five at $449,480.00, and building six at $51,210.00. We remand to the district court for entry of an order consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**